ORAL ARGUMENT IS NOT YET SCHEDULED

No. 25-7034

---

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

HDEEL ABDELHADY,

Appellant,

v.

THE GEORGE WASHINGTON UNIVERSITY, ET AL.,

Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA
(No. 1:22-cv-1334-TNM (McFadden, J.))

---

**APPELLANT'S BRIEF**

---

Hdeel Abdelhady
D.C. Bar No. 483559
1717 Pennsylvania Ave., NW, #1025
Washington, D.C. 20006
(202) 630-2512
habdelhady@mapopllc.com
*Appellant*

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................... i

TABLE OF AUTHORITIES............................................................ iii

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND
RELATED CASES ......................................................................... vii

   I. Parties .................................................................................. vii

   II. Rulings Under Review ........................................................ vii

   III. Related Cases...................................................................... vii

GLOSSARY OF ABBREVIATIONS ............................................ viii

JURISDICTIONAL STATEMENT ................................................. 1

   I. The District Court's Jurisdiction Over Pleaded Claims .............. 1

   II. The District Court Lacked Judicial Power to 'Grant' PMA Summary
     Judgment on Count I.............................................................. 2

   IV.   Appellate Jurisdiction ...................................................... 3

STATEMENT OF ISSUES ............................................................. 4

STATUTES AND REGULATIONS ................................................ 5

STATEMENT OF THE CASE ........................................................ 5

   **I. Introduction** ........................................................................ 5

   II. The Complaint, Motions, and Rulings.................................... 9

   III. Nexus to Plaintiff and Claims .............................................14

   IV.   Procedural History and Rulings ........................................17

SUMMARY OF ARGUMENT ......................................................30

ARGUMENT .................................................................................32

I.   This Court Should Reverse and Vacate All Relief Granted to PMA While in Default and Direct Entry of Default Against PMA.....................................32

II.  Vacatur of PMA Judgment and Reversal of PMA Dismissals....................36

III. The Court Should Reverse Summary Judgment for GWU and Direct Entry of Partial Summary Judgment for Plaintiff.................................................40

IV.  The "Sham Affidavit" Ruling Should be Reversed With Directions to Correct or Withdraw It..............................................................................49

V.   All Rule 12(b)(6) and LCvR 7(b) Dismissals Should be Reversed............51

VI.  Dismissal of Count I Against Aramark ..............................................55

**CONCLUSION** ........................................................................................**57**

**CERTIFICATE OF COMPLIANCE** .............................................................**59**

# TABLE OF AUTHORITIES

## Cases

*Abdelhady v. Geo. Wash. Univ.*,
  89 F. 4th 955 (D.C. Cir. 2024) ........................................................... v

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................52

*Attias v. CareFirst, Inc.*,
  969 F.3d 412 (D.C. Cir. 2020) ........................................................... 3

*Banneker Ventures, LLC v. Graham*,
  798 F.3d 1119 (D.C. Cir. 2015) .......................................................52

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) ...........................................................52

*Canady v. Erby Elekromedizin GmbH*,
  384 F. Supp. 2d 176  (D.D.C. 2005) ..........................................43, 44

*Carino v. Garland*,
  997 F.3d 1053 (9th Cir. 2021) .........................................................36

*Ciralsky v. CIA*,
  355 F.3d 661 (D.C. Cir. 2004) ........................................................... 3

*Cobell v. Norton*,
  206 F.R.D. 27 (D.D.C. 2002)............................................................25

*Curran v. AMI Fireplace Co. Inc.*,
  163 Fed. Appx. 714 (10th Cir. 2006) ..............................................32

*Deanda v. Becerra*,
  96 F.4th 750 (5th Cir. 2024) ...........................................................56

*Galvin v. Eli Lilly & Co.*,
  488 F.3d 1026, 1030 (D.C. Cir. 2007) ..............................40, 42, 48

*Hahn v. Portfolio Servicing, Inc.*,
  424 F. Supp. 3d 614 (N.D. Ca. 2020) ..............................................45

*Hilska v. Jones*,
  297 F. Supp. 2d 82 (D.D.C. 2003) ...................................................25

*Hurd v. D.C., Gov't*,
  864 F.3d 671 (D.C. Cir. 2017)....................................................52, 54

*Johnson v. Executive Office for U.S. Attorneys*,
    310 F.3d 771 (D.C. Cir. 2002) ........................................................... 51

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ........................................................................... 35

*Meiggs v. Associated Builders, Inc*.,
    545 A.2d 631 (D.C. 1988) ................................................................. 11

*Mimms v. CVS Pharm.*, No. 1:15-cv-00970-TWP-MJ, 2016 U.S. Dist. LEXIS
    201748 (S.D. Ind. Jul. 29, 2016) ...................................................... 45

*Nwaneri v. Quinn Emanuel Urquhart & Sullivan, LLP*,
    No. 19-CV-01540 (TNM), 2020 WL 7773391, at *4 (D.D.C. Dec. 30, 2020) ... 35

*Ortiz v. New Mexico*,
    550 F. Supp. 3d 1020, 1078 (D.N.M. 2021) ...................................... 38

*Perez v. Wells Fargo N.A.*,
    774 F.3d 1329 (11th Cir. 2014) ......................................................... 33

*Peterson v. Syracuse Police Dep't*,
    467 F. App'x 31 (2d Cir. 2012) .................................................... 33, 36

*Pyramid Sec. Ltd. v. IB Resol, Inc.*,
    924 F.2d 1114 (D.C. Cir. 1991) .................................................... 40, 49

*Rodriguez v. Doral Mortg. Corp.*,
    57 F.3d 1168 (1st Cir. 1995) .............................................................. 37

*Rohrig v. United States Navy*,
    No. 19-3637, 2020 U.S. App. LEXIS 4245 (6th Cir. Feb. 11, 2020) ................ 37

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ........................................................................... 36

*Thompson v. Dist. of Columbia*,
    832 F.3d 339 (D.C. Cir. 2016) ..................................................... 40, 51

*Unclaimed Prop. Recovery Serv. v. Kaplan*,
    734 F.3d 142 (2d Cir. 2013) .............................................................. 52

*VLM Food Trading Int'l, Inc. v. Illinois Trading Co.*,
    811 F.3d 247 (7th Cir. 2016) ............................................................. 34

*Wash. All. of Tech. Workers v. United States Dep't of Homeland Sec.*,
    892 F.3d 332 (2018) ........................................................................... 51

*Winston & Strawn, L.L.P. v. McLean*,
    843 F.3d 503 (D.C. Cir. 2016) ............................................... 32, 41, 51

## Statutes

28 U.S.C. § 1291 ................................................................................. 3
28 U.S.C. § 956 ...............................................................................33
D.C. Code § 1541(a)(1) ...................................................................11
D.C. Code § 32-1501(3) ................................................................... 9
D.C. Code § 32-1503(a)(1) .............................................................. 9
D.C. Code § 32-1504(b) ................................................................... 9
D.C. Code § 32-1534(a) ..................................................................10
D.C. Code § 32-1536 ......................................................................11
D.C. Code §§ 32-1540(d) ...............................................................11

## Other Authorities

§ 2692 Relief From a Default—In General, 10A Fed. Prac. & Proc. Civ. § 2692
(4th ed.) ........................................................................................33
Federal Judicial Center, Judicial Writing Manual: A Pocket Guide for Judges (2d
ed. 2013) ........................................................................................50

## Rules

D.C. Cir. Rule 32(e)(1) ...................................................................60
Fed. R. App. P. 32(a)(5) ..................................................................60
Fed. R. App. P. 32(a)(6) ..................................................................60
Fed. R. App. P. 32(a)(7)(A) .............................................................60
Fed. R. App. P. 32(a)(7)(B) .............................................................60
Fed. R. App. P. 4(a)(1)(A) ................................................................ 3
Fed. R. Civ. P. 1 .............................................................................32
Fed. R. Civ. P. 12(d) ................................................................52, 53
Fed. R. Civ. P. 54(c) .......................................................................56
Fed. R. Civ. P. 55(a) ................................................................33, 34
Fed. R. Civ. P. 56(c) .......................................................................40
Fed. R. Civ. P. 56(c)(4) ...................................................................41
Fed. R. Civ. P. 56(f) ........................................................................48
Fed. R. Civ. P. 56(h) .......................................................................42
Fed. R. Civ. P. 6(b) .........................................................................35
LCvR 7(b) .......................................................................................54
LCvR 7(e) ......................................................................................... 3

## Regulations

D.C. Mun. Regs. Tit. 7, § 217 .........................................................11
D.C. Mun. Regs. Tit. 7, § 217.4(i) ...................................................11
D.C. Mun. Regs. Tit. 7, § 217.8 .......................................................10

D.C. Mun. Regs. Tit. 7, § 299 ...........................................................................9, 27

D.C. Mun. Regs. Tit. 7, §§ 217.4 .........................................................................10

**Constitutional Provisions**

U.S. Const. art. III, § 2, cl. 1 ................................................................................. 2

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

### I.    Parties

Ms. Abdelhady is the plaintiff. The defendants are The George Washington University (GWU), GWU's "third-party administrator" PMA Management Corporation (PMA), and GWU's "facilities services" contractors, Aramark Services, Inc., and Aramark Management Services Partnership Limited (together "Aramark").

### II.    Rulings Under Review

The rulings under review are the November 29/30, 2022 merits order [No. 63] ('Merits Order') discussed in the Memorandum Opinion [No. 66] ('Merits Opinion' and the February 25, 2025 Memorandum Order [No. 125].

### III.    Related Cases

There are three related cases: *Abdelhady v. George Wash. Univ.* (No. 24-7090); *Abdelhady v. George Wash. Univ., 89* F. 4th 955 (D.C. Cir. 2024) (No. 22-7148) ('*Abdelhady I*'), *Abdelhady v. George Wash. Univ.*, No. 23-7001, 2023 U.S. App. LEXIS 17866 (D.C. Cir. July 13, 2023).

## GLOSSARY OF ABBREVIATIONS

**Aramark**        Together, Aramark Services, Inc. and Aramark Management
                   Services Partnership Limited

**Complaint**      Amended Complaint at ECF No. 13 (sealed); ECF No. 14
                   (redacted)

**DOES**           District of Columbia Department of Employment Services

**GWU or
University**       The George Washington University

**JAS**            Appendix – Sealed Supplement

**PMA**            PMA Management Corporation

**WCA**            District of Columbia Workers' Compensation Act of 1979, D.C.
                   Code §§ 32-1501-45

# JURISDICTIONAL STATEMENT

## I.    The District Court's Jurisdiction Over Pleaded Claims

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1367 over all claims pleaded in the Complaint: eight total, all asserted against GWU, seven against PMA, and two against Aramark. The table below reflects the district court's summary of the claims, in the February 25, 2025 Memorandum Order. JA525-26.

| Amended Complaint [ECF No. 14] Pleaded Claims | | | | | |
|---|---|---|---|---|---|
| **Count** | **Claim** | **Pleaded Against** | **Compl.¶** | **Disposition** | **Order** |
| **I** | Negligence/ Premises Liability | GWU | ¶ 297 | Summary Judgment | Merits Order |
| | | Aramark | | With prejudice dismissal, Rule 41(a)(2) | 2/25/25 Mem. Order |
| **II** | Racketeering (18 U.S.C. § 1964) | GWU, PMA | ¶ 304 | 12(b)(6) dismissal | Merits Order |
| **III** | NIED | GWU, PMA | ¶ 319 | 12(b)(6) dismissal | |
| | | Aramark | | Court-ordered with prejudice dismissal, Rule 41(a)(2) | 2/26/25 Min. Order |
| **IV** | Fraudulent Misrepresentation | GWU, PMA | ¶ 324 | 12(b)(6) dismissal | Merits Order |
| **V** | Fraud | GWU, PMA | ¶ 333 | 12(b)(6) dismissal | Merits Order |

| VI | Negligence per se | GWU, PMA, Aramark | ¶ 340 | With prejudice dismissal, Rule 41(a)(2)[1] | 2/26/25 Min. Order |
|---|---|---|---|---|---|
| VII | Gross negligence | GWU, PMA, Aramark | ¶ 345 | With prejudice dismissal, Rule 41(a)(2) | 2/26/25 Min. Order |
| VIII | Tortious Inducement of Breach of Fiduciary Duty | GWU, PMA | ¶ 352 | 12(b)(6) dismissal | Merits Order |
| IX | Abuse of Process | GWU, PMA | ¶ 360 | 12(b)(6) dismissal | Merits Order |
| X | Violation of Rights (42 U.S.C. § 1983) | GWU, PMA | ¶ 370 | 12(b)(6) dismissal | Merits Order |

## II.     The District Court Lacked Judicial Power to 'Grant' PMA Summary Judgment on Count I

In the Merits Order, the district court granted PMA summary judgment on

Count I, even though Count I was not pleaded against PMA. Compl. ¶ 297, Merits

Order at 1; JA70, 476. There was no Article III "controversy' between Plaintiff and

PMA on this count. U.S. Const. art. III, § 2, cl. 1. The court lacked judicial power

to grant PMA judgment on Count I. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332,

341 (2006) ('If a dispute is not a proper case or controversy, the courts have no

business deciding it, or expounding the law in the course of doing so.'). The

---

[1] Plaintiff withdrew Counts VI-VII on August 22, 2022. JA237-38, 490.

February 25 Memorandum Order belatedly acknowledged that Count I was not pleaded against PMA, but the Court failed to correct it.[2] JA525.

## IV.    Appellate Jurisdiction

The February 26 minute order is a final, appealable order. 28 U.S.C. § 1291; JA15. It resolved 'every claim of every party,' *Attias v. CareFirst, Inc.*, 969 F.3d 412, 416 (D.C. Cir. 2020), and created a 'final disposition for appellate review.' *Blue*, 764 F.3d at 16-17. Appellant timely appealed. Fed. R. App. P. 4(a)(1)(A). This Court's jurisdiction extends to all preceding orders. *Ciralsky v. CIA*, 355 F.3d 661, 668 (D.C. Cir. 2004) ('earlier non-final orders merge with the final judgment and may be challenged in an appeal from that judgment').

---

[2] Plaintiff first alerted the district court that Count I was not pleaded against PMA on November 29, 2022. ECF No. 65 ¶ 4. The district court disregarded the issue. In the ensuing three weeks, plaintiff moved for leave to file Rule 54(b) memoranda in excess of the district court's ten-page limit on Rule 54(b) "reconsideration" memoranda, arguing that the Court lacked judicial power to adjudicate an unpleaded claim. JA456. The Court summarily denied leave to file although the memoranda were under the 45-page limit prescribed by LCvR 7(e). Min. Order, Dec. 27, 2022, JA10. Plaintiff again briefed the issue in her December 27, 2022 motion for final judgment. ECF No. 69 ¶ 5. In denying the motion, the Court affirmed that it granted PMA "final" summary judgment but did not address plaintiff's arguments. Mem. Order, ECF No. 87 at 4. In her second motion for final judgment, filed in June 2024, plaintiff again briefed the issue. ECF No. 112-1 at 19-20. The Court did not address it in the February 25, 2025 Memorandum Order resolving that motion. JA516-32.

## STATEMENT OF ISSUES

1.      Did the district court err in granting PMA dispositive and procedural relief where: (1) PMA defaulted and remained in default; (2) the Court granted PMA summary judgment in the absence of a 'controversy'; and, (3) the Court *sub silentio* "adopted" GWU's dispositive motions, replies, and extrinsic submissions for PMA?

2.      Did the district court err in granting GWU summary judgment on Count I in reliance on GWU's motion lacking substantive legal foundation, disputing material facts, and reliant on inadmissible evidence? Relatedly, did the Court err in excluding all of plaintiff's summary judgment evidence under the "sham affidavit" rule based on GWU's distortion of the affidavit?

3.      Did the district court err in dismissing six claims under Rule 12(b)(6) in reliance on GWU's voluminous extra-pleading submissions without converting GWU's motion under Rule 12(d) with notice and discovery?

4.      Did the Court incorrectly dismiss for GWU and PMA the two fraud claims as 'conceded' under LCvR 7(b) where plaintiff opposed GWU's motion and the district court was obliged to follow the Federal Rules?

5.      Did the district court incorrectly dismiss Count I against Aramark with prejudice, stating it granted plaintiff's motion although the motion requested dismissal with prejudice only of Count III?

4

## STATUTES AND REGULATIONS

Pertinent provisions of the District of Columbia Workers' Compensation Act of 1979, D.C. Code §§ 32-1501-45 (WCA) and its implementing regulations at Title 7, Chapter 2 of the District of Columbia Municipal Regulations (Private Sector Workers' Compensation) are set forth in the addendum to this brief.

## STATEMENT OF THE CASE

### I.    Introduction

The core of the Complaint is GWU's alleged deception of the District of Columbia workers' compensation system and its stakeholders, including GWU employees and other employers. JA60-69. PMA allegedly participated in and aided in the scheme, along with others associated in fact with GWU. JA34-68.

Plaintiff has been affiliated with GWU as an adjunct law professor for over 20 years. JA19; JAS1-2, 8-11. She became a target of the alleged scheme—and was harmed by it—after suffering injuries on GWU's premises and taking at face value its representations that it was validly self-insured and otherwise compliant with the WCA. JA18, 38-44.

In the district court, Plaintiff seeks redress for non-physical harms inflicted by GWU and PMA after her injury, in furtherance of the alleged scheme. She also seeks damages at Count I for the physical injuries caused by the over six-year-old accident. JA70. They remain legally unremediated.

5

On appeal, plaintiff seeks review of the dispositive and procedural rulings in the Merits Order and February 25, 2025 Memorandum Order. The Complaint remains untested and unanswered under Rule 12(b)(6) or 56, under which all claims were assertedly challenged and resolved.

The district court disregarded most factual allegations, mischaracterized the few it referenced, used a handful of words from plaintiff's oppositions as proxies for the Complaint, and credited improper fact pleadings and other extrinsic matters in dispositive motions and replies to which the Court denied leave to file lodged surreplies. In short, the Court transposed the parties' roles.

The district court confirmed this nearly two years later, in its order on remand from *Abdelhady I* (Remand Order) stating it had "expressly relied on" GWU's extra-pleading reply exhibits "in ruling on GWU's motion to dismiss" under Rule 12(b)(6). JA520. The Merits Order, however, is silent on the issue.

In the pending appeal from the Remand Order, GWU stated that it filed 13 extra-pleading reply exhibits to "refute" the Complaint's allegations. The University explicitly asked the district court to grant its Rule 12(b)(6) motion in reliance on its "companion" summary judgment motion and reply that GWU "incorporated" in its Rule 12(b)(6) reply. JA322.

The district court also dismissed both fraud claims as "conceded" under LCvR 7(b). JA494, 497. Plaintiff timely Rule 12(b)(6) and summary judgment oppositions and lodged two surreplies addressing GWU's new arguments and 13 more extrinsic exhibits.

The district court deemed PMA's "motion to dismiss" "conceded." The motion is a two-paragraph document, submitted after PMA defaulted and claiming to "adopt" GWU's entire Rule 12(b)(6) motion. JA194. Without ruling on plaintiff's opposition to the "adoption," the Court granted the motion under Rule 12(b)(6). JA279. JA484. In the final footnote on the 32-page Merits Opinion's penultimate page, the Court announced that it had exercised "discretion" to partly convert PMA's "motion to dismiss" because it "considers matters outside the pleadings." JA516.

The Court did not identify those "matters" or which of its two paragraphs it converted. Throughout the Merits Opinion, the Court attributes arguments to "Defendants" GWU and PMA. JA486-517. The Court granted PMA summary judgment on Count I, although not pleaded against or in issue with PMA—without notice or discovery. JA484. *Sub silentio*, the Court "adopted" GWU's Rule 12(b)(6) and summary judgment motions, replies, and 16 extrinsic exhibits on PMA's behalf. The Court did not, however, convert GWU's motion.

In the February 25, 2025 Memorandum Order, the district court acknowledged that the Federal Rules did not permit PMA to adopt another GWU motion. JA538. But it did not correct its dispositive rulings for PMA or resolve its opposed two-paragraph motion.

No discovery occurred before all claims against GWU and PMA were terminated. Plaintiff's requests for discovery under Rules 12(d) and 56, in oppositions and lodged surreplies, were not addressed. JA208, 214-15, 250, 267-68, 352-55, 357, 389-90. The Court entered its first scheduling order – applicable to plaintiff and Aramark - six months into the case, and one day after disposing of claims against GWU and PMA. JA458.

The departures from the Federal and Local Rules, and the record, were pervasive. GWU and PMA are nongovernmental corporate entities, and PMA is ultimately owned by a publicly traded company. JA18-19. Neither filed a corporate disclosure statement under Fed. R. Civ. P. 7.1 and LCvR 26.1. The Court did not indicate if it had independently evaluated potential conflicts of interest without the required disclosures.

On February 25, the district court dismissed Count I against Aramark with prejudice, stating granted Plaintiff's motion for that relief. JA529. However, plaintiff moved to dismiss only Count III. ECF No. 119. The same order denied plaintiff's uncontested motion for entry of default against PMA, filed on August 1,

2022. JA 167. PMA never set aside its default but remained a participant after August 4, 2022, when it appeared with an extension motion that the district court granted within 35 minutes. JA178-79.

Plaintiff seeks review of these dispositive and procedural rulings.

## II.    The Complaint, Motions, and Rulings

### A. The Alleged Scheme

#### (1) Regulatory Framework

The WCA covers accidental injuries and deaths that "occur in the District of Columbia if the employer performed work for the employer, at the time of injury or death." D.C. Code § 32-1503(a)(1) ("coverage"). Where the Act applies, the "compensation to which an employee is entitled" becomes the employee's "exclusive remedy against the employer," or the employer's "insurer."[3] D.C. Code § 32-1504(b). However, "if an employer fails to secure payment of compensation as required by this chapter, an injured employee . . . may elect to claim compensation under this chapter, or to maintain an action at law for damages on account of such injury or death." *Id*.

---

[3] An "insurer" is an insurance "carrier" authorized to insure for workers' compensation or a self-insured employer. D.C. Mun. Regs. Tit. 7, § 299; D.C. Code § 32-1501(3).

An employer secures payment of compensation mainly by a carrier-issued insurance policy or self-insurance. D.C. Code § 32-1534(a); Compl. ¶ 207. To obtain valid self-insured status, an employer applicant must *accurately* report to DOES their annual: (1) payroll amount, (2) employee headcount, and (3) "loss experience" including the number and kinds of injuries resulting in disability of more than three days during the preceding three years. D.C. Mun. Regs. Tit. 7, §§ 217.4, 217.8. Applicants for initial or renewed self-insurance must also secure excess workers' compensation insurance and a valid surety bond, with premiums and terms based on accurate payroll, headcount, and classification data. *Id*.; JA60.

Accurate reporting is critical. Payroll, headcount, and loss experience are material data points on which qualification for, and the terms of, self-insurance or private excess insurance are determined. JA60. The WCA reinforces the importance of accuracy by requiring applicants for annual self-insurance renewal submit "sworn" payroll, headcount, and loss experience reports. D.C. Mun. Regs. Tit. 7, § 217.8.

These requirements ensure that employers fulfill their side of the "grand bargain": "In return for *the purchase of insurance* against job related injuries, the employer receives tort immunity; in return for giving up the right to sue the employer, the employee receives swift and sure benefits." Compl. ¶ 197 (quoting *Meiggs v. Associated Builders, Inc*., 545 A.2d 631,637 (D.C. 1988) (emphasis

10

added). Accordingly, all employers must post notice to their employees notice that the "employer has secured the payment of compensation in accordance with the provisions of" the WCA. D.C. Code § 32-1536; Comp. ¶ 210.

Additionally, employers must contribute annually to the system-wide Administration and Special Funds based on their *actual* share of all employers' "paid losses." D.C. Code §§ 32-1540(d), 1541(a)(1); JA43. Self-insured employers calculate contributions directly or through a "self-insured service organization," such as a third-party administrator. D.C. Mun. Regs. Tit. 7, § 217.4(i). Again, accuracy is critical.

Further reinforcing the regulations and their policy purpose, employers, "as a condition precedent to self-insurance authorization," must execute an undertaking to pay all compensation when due, deposit security such a surety bond, "timely pay the appropriate share of the cost of administration," and, "maintain excess insurance coverage." *Id.* § 217.5. The regulations mandate the DOES to enforce all regulations, without discretion. *See generally* D.C. Mun. Regs. Tit. 7, § 217.

### (2) Factual Allegations

Plaintiff allegations include that GWU did not secure payment of compensation,  but obtained the veneer of self-insured status by underreporting its payroll and headcount, inaccurately classifying its employees in low risk and cost

workers' compensation classification codes while employing workers in higher injury risk classifications, and artificially deflating its workers' compensation loss experience by making, maintaining, and submitting injury and claims records that omitted and obscured the number and scope of injuries and claims. [4]

The Complaint further alleges that GWU did not lawfully or at all obtain excess insurance and a valid surety bond, but obtained any excess policy by the same payroll, headcount, and loss experience misreporting.[5] *Id.* ¶ 254.

For example, in a self-insurance application, GWU reported a $ 534,200,809 payroll for 2019-2020. Compl. ¶ 242. But in a public, GWU-commissioned report about its "economic value to" the District, GWU reported a 2019-2020 payroll of $915.9 million. *Id.* GWU reported to the DOES a 2020 headcount of 9,807

---

[4] Compl. ¶¶ 237-88 (financial, legal, and operational gain), 137, 207-09 (WCA self-insurance requirements), 199, 208, 240-48, 252-85 (payroll, classification codes, headcounts, injury logs, and loss experience), 105-06, 109, 250, 285-86 (billing health insurance), 249-50 (litigation against employees), 210-33 (refusal to post or furnish "self-insured" information), 142-44, 241-53 (Special and Administration Funds), 306-07 (pleading Count II based on the alleged pattern), 324, 324-29 (pleading Count IV based on the alleged pattern). *Id.* ¶¶ 105, 142-43, 238-88.

[5] Whether GWU obtained a valid surety bond was governed by, *e.g.*, substantive law on surety undertakings. MSJ Opp'n, JA257-58. Whether GWU lawfully obtained an excess insurance policy is governed by substantive insurance law under which, *e.g.*, an insurance policy obtained by material misrepresentation is void *ab initio.* MTD Opp'n, JA 226 (discussing, *e.g.*, *Colonial Penn Ins. Co. v. Owens*, 728 F. Supp. 798, 802 (D.D.C. 1990)). GWU did not address any of these issues as alleged or under substantive law. JA291-332.

employees, but recorded 12,438 "average annual employees" in its OSHA logs as of September 2019. *Id.* ¶ 245.

The financial benefits of self-insured status are significant. Had GWU been carrier-insured—and using its reported DOES numbers – its premium price would have approximated some $1.8 million, before upward "modification" for loss experience based on GWU's true injury record at relevant times. *Id.* ¶ 242. Instead of a premium, the University's annual outlay is to the Administration and Special Funds, to which the University paid annually amounts ranging from $9,146 in 2020 and $194,214 in 2018. *Id.* ¶ 253. These contributions require accurate loss experience calculations and records to be compliant.

GWU did not post notice that it secured compensation, and evaded through its Office of General Counsel, Office of Risk Management and Insurance, and Finance Division leadership inquiries about poster locations. *Id.* ¶¶ 212-15. When Ms. Abdelhady questioned GWU's self-insured status, GWU and PMA – always acting together, including through shared counsel and sundry vendors – failed to respond. *Id*. ¶¶ 217-19; JA38-69 *generally*.

In December 2021, then on notice of anticipated litigation challenging its self-insured claims, GWU transmitted to plaintiff a "DOES certificate" of self-insurance for 2018-2019 as proof of self-insured status. *Id.* ¶¶ 223-24. It emerged during the litigation below that GWU procured had procured that certificate in

anticipation of it. In late November 2021, GWU's Deputy General Counsel directed Office of Risk Management and Insurance personnel to procure that exact certificate from the DOES, stating: "There is no indication . . . what if any WC [workers' compensation] coverage we have." JA431. GWU filed that exhibit in the district court – through the same office of Risk Management employee – on summary judgment, as discussed below.

### III.    Nexus to Plaintiff and Claims

In May 2019, plaintiff was injured at GWU after attending an "adjunct appreciation" event to receive an award for then 15 years of teaching affiliation with the law school. JA19; JAS1-2, 12-15. One of the injuries was "temporarily totally disabling" in workers' compensation terms. JA27; Pl. Aff. ¶ 51, JAS6. Plaintiff asserts she was an invitee and pleads Count I against GWU as property owner/invitor, and against Aramark as GWU's facilities contractors. JA19.

Relying on GWU's representations that it was validly self-insured and maintained a compliant workers' compensation program, plaintiff filed a claim with the DOES weeks after the accident, while injured. JA33. She did not under the circumstances verify GWU's status or the WCA's applicability to her injuries. *Id.* By fling, she became a target of GWU and PMA's pattern. JA32-52.

GWU and PMA neither furnished the statutory remedy nor properly contested it. JA38-52. Nearly two years later, plaintiff withdrew the claim. GWU

and PMA did not contest the withdrawal, but disagreed with her assertions about their misconduct and the validity of GWU's self-insured status that PMA perpetuated. JAS3.

In connection with the uncontested withdrawal, GWU and PMA filed a September 2021 "Memo of Payment of Compensation" that was required more than a year earlier. The memo confirmed that GWU and PMA had, during the nine-month pendency of the claim, paid less than the legal minimum wage indemnification—while simultaneously asserting they had "voluntarily" furnished the statutory remedy. JA47; JAS4, 28.

That same month, PMA (and later GWU) demanded that a medical provider refund over $10,000 for treatment rendered more than a year earlier—treatment GWU and PMA had represented was covered. JAS7, 48-52. Plaintiff was not notified of this demand, which increased her unreimbursed medical costs. She learned of it from the provider. JAS7.

Soon after the claim was filed, GWU and PMA submitted "notices of controversion," asserting the injuries were not employment-related and disputing disability due to lack of records—despite having hundreds of pages of medical documentation. JA23, 38-39, 52. About three months after the accident, plaintiff sought adjudication on medical benefits, wage indemnification, and bad faith. GWU and PMA disrupted the proceeding. JA43-44.

15

Weeks after the ALJ was assigned, they initiated *ex parte* contact with her, offering to assist with her pending application for a state judgeship. JA44-45. The ALJ accepted without disclosure. *Id.* Later, GWU and PMA obtained nine subpoenas off the record—eight to providers, one to plaintiff's law firm. JA45, 48-50. They falsely told providers plaintiff had been given notice and an opportunity to object, and that the subpoenas complied with District law and HIPAA. JA48-50. On the record, they admitted withholding notice to avoid objection, and that their representations were knowingly misleading. *Id.* They also admitted wording the subpoenas to induce over-disclosure, and to having experience doing so. *Id.*

As a result, medical providers disclosed both accident-related and unrelated records unlawfully and in breach of patient trust. A later HHS investigation confirmed the disclosures were unlawful. JA49.

In prehearing filings, GWU and PMA denied plaintiff was a GWU employee on the accident date and disputed the WCA's applicability and the DOES' jurisdiction. JA48. To support this, they submitted a document they claimed was plaintiff's GWU "payroll record," omitting a salary payment made after the accident. JA50-51. GWU's payroll services later confirmed it did not produce the record. JA50. After plaintiff moved to stay proceedings to pursue remedies at law, GWU and PMA sent a letter stating they would no longer contest her employment status. The letter had no legal effect under procedural rules—it was legal arbitrage.

16

GWU and PMA also made broad and pretextual discovery demands, including requests for plaintiff's "client contracts" and privileged information—outside the bounds of the WCA and plaintiff's professional obligations. JA40. Their September 2021 memo, documenting failure to pay even the legal minimum wage indemnification, confirmed these demands were unauthorized and in bad faith. JA46.

Plaintiff moved to disqualify the ALJ after learning of the undisclosed *ex parte* communication that the ALJ admitted and GWU and PMA treated as business as usual. The ALJ denied the motion and dismissed the proceeding, citing plaintiff's noncompliance with discovery demands. JA45-46. In the same order, the ALJ admitted the subpoenas were invalid but claimed the relevant law was not "long-standing"—though it had been in effect for years. JA45.

The DOES claim was never adjudicated or resolved. No compensation order was issued granting or denying WCA relief. As discussed below, GWU conceded this in its dispositive motions, but changed its story in its replies making new arguments, fact clams, and submitting 13 additional extra-pleading exhibits.

## IV.    Procedural History and Rulings

### A. PMA's Default and "Motion to Dismiss'

PMA defaulted by failing to timely respond to the original and amended complaints. JA3-4. Three days after Plaintiff moved for default entry, PMA

appeared seeking an extension under Fed. R. Civ. P. 6(b), claiming it "received" the Complaint that day (August 4). JA167-77. Within 35 minutes, the Court granted PMA's motion under Rule 6(b) without inviting Plaintiff's response, finding good cause, or addressing PMA's default status under Rule 55(c). JA178-79.

Plaintiff moved for reconsideration with evidence that PMA had monitored the docket and retained counsel on August 2 specifically to oppose default, despite first being served June 9. JA180-94. In opposition, PMA changed its story, claiming August 4 was when "counsel was retained and made aware of the pending litigation." JA201. The Court denied reconsideration three months later without explanation, facilitating all subsequent relief to PMA *while in default*. JA489. In the February 25, 2025 Memorandum Order, the Court denied plaintiff's August 1, 2022 motion for entry of default that was directed to the Clerk. JA539.

The Court granted summary judgment on Count I to PMA by assertedly converting "in part" PMA's "motion to dismiss" "because the Court considered matters outside the pleadings," but did not identify the part or matters. JA482, 516. Nor did the Court disclose that PMA's "motion to dismiss" was the two-paragraph, substance free motion PMA filed claiming to "adopt" GWU's entire Rule 12(b)(6) motion. JA194-95. Plaintiff opposed the "adoption" motion that PMA called a "motion to dismiss." JA279.

To justify "conversion" without notice, the Court invoked *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006) for the proposition that notice was not required because plaintiff had "ample opportunity to present material" through "earlier workers' compensation proceedings." JA516. The Court did not explain how "earlier proceedings substituted for discovery under the Federal Rules. Nor does the Merits Opinion disclose that *no discovery occurred. Id.*

PMA filed a "response" to plaintiff's opposition to its adoption motion, after its time to respond under the instantaneous August 4 order had expired. JA325. The "response" was PMA's first filing – while in default – making arguments that plaintiff moved to strike. JA409. The Court summarily declined to strike the response, granted PMA another Rule 6(b) extension because PMA's unspecified "clerical error" was "excusable neglect," and stated that it would not consider PMA's "new arguments" in "reply," suggesting that PMA's two-paragraph adoption motion made old arguments. JA489. The Merits Order does not mention PMA's continuing default.

The Court based the judgment on PMA's unsubstantiated claim in its untimely 'response' that it was an "**insurer**" and as such entitled to be "excluded" from the entire action under the WCA's 'exclusive remedy' provision. JA504, 516, 327-28. As plaintiff argued in response to the surprise judgment, PMA was not and

did not show it was an 'insurer' under the WCA. By treating PMA as an "insurer" covered by the exclusive remedy provision, the Court armed PMA with a judicial decision to wield against plaintiff and potentially other persons asserting negligence claims arguably or certainly within the WCA's scope. JA464-465. Plaintiff raised the issues shortly after the Merits Order issued, but the Court denied leave to file it under its Standing Order's ten-page limit. JA10, 464-65.

## B. Count I; Summary Judgment for GWU and the "Sham Affidavit"[6]

### (1) GWU's Motions

GWU concurrently moved for dismissal under Rule 12(b)(6) and for "partial" summary judgment requesting a "judicial determination" that it was "a lawful self-insured employer *in compliance with District of Columbia law*" under the WCA and "immune" from suit on *all claims* under the exclusive remedy provision. JA128. The Court did not address plaintiff's response that the "judicial determination" was in substance a counterclaim that GWU was required to plead. JA267-68.

---

[6] Plaintiff's allegations of the concerning the workers' compensation scheme, as well those alleging fraud, including mail and wire fraud, directly support the racketeering and fraud claims, and indirectly support Counts III and VIII-X, because plaintiff alleges that GWU and PMA were motivated by the scheme to inflict non-physical injuries. The scheme allegations also support Count I against GWU, related to the applicability of the WCA's exclusive remedy provision. Because the district court, as discussed further below, did not consider the Complaint, plaintiff principally challenges the dismissals for GWU under Rules 12(b)(6) and 12(d), and LCvR 7(b).

GWU explicitly asked the Court to grant Rule 12(b)(6) dismissal based on "companion" summary judgment motion and exhibits. JA125-26, 28. But GWU failed to respond to the Complaint, citing only three of its 285 factual paragraphs and recasting the case as a grievance about its purported "mishandling" of a compensation claim. JA99-100.[7]

### (2) WCA Issues

Count I raised two threshold issues under the WCA: (1) whether the Act applied to plaintiff's injuries at all, and (2) whether GWU did not secure payment of compensation by lawful self-insurance. GWU failed those issues. It did not counter plaintiff's allegation that she was an "invitee," not performing work for GWU. Its entire legal argument was a block quote of the exclusive remedy provision; it did not reference any WCA self-insurance provisions although the Complaint and oppositions rely on them.  JA42, 46, 53-55, 285, 261, 276; JAS55.

### (3) GWU's Exhibits

GWU submitted five exhibits, but failed to establish their admissibility. JA124-65. The exhibits included the DOES certificate obtained at GWU counsel's direction just months before litigation began and more than three years after the

---

[7] MTD at 16 (referencing ¶ 304 on the RICO claim), 21 (¶¶ 323–38 on fraud), 25 (¶¶ 352–53 on inducement), 27, 29 (¶¶ 359–67 on abuse of process), 30 (¶¶ 368–73 on rights violations); MSJ at 3 (citing ¶¶ 3, 12, 123, 125). JA104, 109, 113, 115, 117-18, 126.

certificate's stated coverage period. JA136. All were attached to an affidavit from GWU employee Jefferson Smith—the same employee who requested the certificate at counsel's instruction and swore to "personal knowledge" of GWU's status. JA130. Ms. Abdelhady moved to strike for lack of personal knowledge, competence, and other grounds under Rule 56 and the Federal Rules of Evidence. JA275.

Hours before filing his affidavit, Mr. Smith emailed a DOES examiner text from the affidavit and asked for "help" completing it. JA428-29. The DOES employee – GWU's regulator—obliged, effectively becoming a shadow witness. *Id.* Ms. Abdelhady lodged copies of those and other emails, including to procure the DOES certificate, that she obtained from the DOES after moving to strike, and moved for leave to supplement her motion arguing additionally that the certificate was not a GWU business record and obtained for litigation. JA421-27.

Mr. Smith's other emails with the same DOES employee showed that he lacked even the most basic knowledge of self-insurance and the WCA. When asked in April 2021 to provide GWU's workers' compensation classification codes, Mr. Smith replied: **"**we are not sure exactly what you are seeking. Are you requesting a specific report? Would this be a regulatory report? We would like to get you what you need but need a little clarification first." JA427, 435. According

to his affidavit, he had been GWU's 'Assistant Director, Insurance and Contracts Risk Management and Insurance since 2009.' JA130.

Another exhibit was a June 2018 DOES letter stating GWU had been reauthorized as a self-insured and that DOES was "in receipt" of "your company's" excess insurance policy. JA131. The letter was irrelevant—plaintiff alleges that GWU illegitimately obtained self-insured status. Mr. Smith also submitted the referenced excess policy that is dated *five days after* the DOES letter, putting in doubt that the DOES was "in receipt" of the policy, and the letters' other contents. JA145.

Without leave or explanation, GWU redacted the policy's headcount, payroll, and premium rate—the very data from that plaintiff alleges GWU inaccurately reported to obtain excess insurance, if it did at all. JA145-46. Mr. Smith attested that GWU "procured" excess insurance, but not how or if the policy was in effect on the accident date. JA131. Nor did he authenticate the document or any exhibit. *Id.* Ms. Abdelhady repeatedly objected to the redactions and again requested discovery. JA225, 262, 367, 400-01, 416. GWU failed to address the objections in reply, and the district did not address or reference them.

Next, Mr. Smith stated that GWU "posted the required Indemnity Bond" with the DOES, but did not authenticate it or otherwise establish admissibility. JA131. The "Indemnity Bond" is two single pages entitled, each "Continuation

23

Certificate." JA134-35. There was no "bond," "surety bond," or facts—just the legal conclusion that Mr. Smith was not competent make. The certificate purportedly covering July 2018 to July 2019 is not signed by the surety. JA135. GWU did not address Ms. Abdelhady's arguments that an unsigned performance undertaking is not valid under District law. JA259-60. Nor did the Court.

### (4) Plaintiff's Affidavit and Exhibits

In opposition, plaintiff a 55-paragraph affidavit and 22 exhibits. JAS1-52. They included GWU self-insurance applications obtained from the DOES, documenting that GWU reported a payroll of $534 million for the same period in which it elsewhere claimed a payroll of $915 million for the same period, underreported its headcount by several thousand fewer employees than recorded in its OSHA logs, and inaccurately reporting its loss experience related to plaintiff herself. JA36, 42-46. At GWU's request, the Court excluded all of plaintiff's evidence under the "sham affidavit" rule, discussed below.

### (5) Lawful Self-Insured Ruling

In declaring GWU "a lawful self-insured employer under the WCA," the Court recited GWU's exhibits almost exactly as GWU did, without legal or evidentiary foundation, or mention that the purported excess policy was materially redacted. JA512-513. The Court denied plaintiff's motions to strike the Smith Affidavit and to supplement with the new evidence, stating that Mr. Smith had

personal knowledge because "explicitly" he said he did. JA513 (citing *Canady v. Erby Elekromedizin GmbH*, 384 F. Supp. 2d 176, 180 (D.D.C. 2005) and *Wye Oak Tech., Inc. v. Republic of Iraq*, No. 10-cv-01182, 2018 WL 5983385, at *8 (D.D.C. Nov. 14, 2018)).

Diminishing GWU's failure to engage with the Complaint – except with redactions of material information – the district court stated that plaintiff's claim that GWU was not lawfully self-insured was "patently frivolous," but characterized the "claim" as GWU "has yet to provide information to establish that it properly obtained self-insurance."[8] JA512. Those 13 words were sourced from plaintiff's 22-page summary judgment opposition requesting discovery under the heading

**"DEFENDANT'S MOTION IS PREMATURE AND MUST BE DENIED AS DISPUTES OF MATERIAL FACTS EXIST THAT REQUIRE DISCOVERY**." JA269.

---

[8] A "patently frivolous" claim is one "premised on clearly baseless factual allegations that describe fantastic or delusional scenarios, rising to the level of the irrational or the wholly incredible," such as "that a Secret Branch of the Federal Government' took the plaintiff's face off of his head, went into his skull, and placed a computer chip and camera system there to project images in front of him." *Hilska v. Jones*, 297 F. Supp. 2d 82, 87-88 (D.D.C. 2003) (internal quotations omitted). If the district court believed that the attorney plaintiff, who was not entitled to "special solicitude," made "patently frivolous" claim, it should have and likely would have pursued sanctions. *Cobell v. Norton*, 206 F.R.D. 27, 29 (D.D.C. 2002) (imposing sanctions where a protective order, sought on inaccurate factual grounds, was "patently frivolous").

The Court also faulted plaintiff for not "produc[ing] any evidence suggesting that GW fraudulently obtained insurance coverage," suggesting inaccurately that plaintiff, through discovery, had an opportunity to counter evidence in GWU's possession and disregarding the Complaint. JA472, 514.

### (6) WCA Applicability and "Sham Affidavit" Rulings

Ms. Abdelhady argued that even if GWU established it secured payment of compensation by valid self-insurance, the WCA was inapplicable because she was not performing work for GWU when injured, and GWU was estopped from asserting the exclusive remedy that it failed to furnish, repudiated in the DOES, and obstructed. JA217-19, 222-23.

Plaintiff filed evidence – GWU's undisputed business records – showing she voluntarily attended the adjunct event, as invited based on her first teaching appointment in 2004, and had finished teaching before the event. JAS1-2, 8-16. She also filed the GWU and PMA September 2021 Memo of Compensation admitting they had paid less than the legal minimum compensation. JA14. Another September 2021 document was the demand that a medical provider refund more than $10,000 for medical treatment, effectively increasing plaintiff's substantial medical costs. JA47-52.

Rather than respond to this evidence – and the evidence of its alleged scheme -- GWU fundamentally changed its factual position. In its Rule 12(b)(6)

motion, GWU admitted there was no 'final adjudication of any aspect of . . . [plaintiff's] worker's compensation claim or that such an adjudication has been reduced to a legally enforceable judgment.' JA106.

However, in its summary judgment reply, GWU completely reversed course, claiming "there is no dispute of material fact" that "adjudication of Plaintiff's workers" compensation claim occurred' and that Plaintiff was paid benefits as a GWU employee injured on the job. JA293. In other words, GWU disputed yet more material facts in reply. GWU never produced a DOES "compensation order" that "rejects a claim or which makes an award of compensation in respect of a claim under the Act." D.C. Mun. Regs. Tit. 7, § 299. No such order exists.

To exclude plaintiff's evidence, GWU claimed her affidavit was a "sham" because plaintiff falsely attested—as a "member of the District of Columbia bar"— that she was not a GWU employee when injured. JA294-96. The affidavit says no such thing. JA297-98; JAS38.  Accordingly, GWU did not quote or cite it. The other part of the "sham" was that plaintiff's affidavit contradicted her December 2019 DOES affidavit – filed while injured – stating that she was employed by GWU at all relevant times. The earlier affidavit was incorrect—as GWU's records document, plaintiff was never continuously a GWU employee, but is an employee only in semesters in which she teaches. JAS8-11.

27

The Court adopted the sham affidavit construction and excluded plaintiff's entire affidavit and 22 exhibits. JA510-12. Compensating for GWU's failure to quote or cite the affidavit or contest evidence, the Court altered the affidavit's language, rewriting it to say that Ms. "Abdelhady produced a payroll record that she claims 'indicat[es] that . . . she was not employed by GWU after April 30, 2019.'" *Id.* at 26 (citing ECF No. 26-5 at 29). The affidavit states that GWU and PMA – not plaintiff – filed the "false payroll record" in the DOES "indicating that I received no salary from GWU after April 30, 2019, and was not employed by GWU after April 30, 2019." Pl. Aff. ¶ 28, JAS3.

Not only was the affidavit clear, the Complaint mentions "false" and "purported" "payroll record" 13 times and alleges repeatedly that GWU and PMA fabricated and filed it to avoid Plaintiff's claim and exclude it from GWU's loss experience. Compl. ¶¶ 163-64, 166, 189-94, 198, 306(c)(xi). One of the Complaint's headings is "GWU and PMA Deny That Ms. Abdelhady Was a GWU Employee . . . and File a False "Payroll Record."[9] JA47. Plaintiff states as a material fact not in dispute that "Defendant GW filed false payroll documents with the D.C. DOES in September of 2021." JA13. Plaintiff reaffirmed in her Rule 12(b)(6) opposition – in response to GWU's mischaracterizations of the Complaint

---

[9] Plaintiff raised the Court's problematic account of the record multiple times, including in two Rule 54(b) motions thoroughly briefing the issue. JA473-76.

by way of improper fact pleading – that "Plaintiff alleges that GW denied . . . that Plaintiff was an employee of GWU on May 15, 2019 . . . [and] ***GW filed a GWU 'payroll record' indicating that Plaintiff's parttime employment with GW terminated on April 30, 2019***." JA309.

The purported employment denial was immaterial. The issue was not whether plaintiff was a GWU employee, it was whether she was performing work for GWU when injured. D.C. Code § 32-1503(a)(1). The district court knew that, concluding that plaintiff was not acting in the course and scope of her employment.

Citing plaintiff's opposition, but not her exhibits, the "Court accept[ed] Abdelhady's undisputed assertion that her contractual arrangement with GW did not formally obligate her to attend the adjunct appreciation luncheon that preceded her fall." JA508. Nevertheless, the Court concluded that she "fell on GW's campus because of her employment obligations: but for her teaching, she would not have been invited to the faculty appreciation luncheon.'" JA508-09. Crucially, the Court did not specify if the pertinent "teaching" was in the Spring of 2019 or generally over the relevant fifteen-year period. *Id.* Nor did the Court cite evidence.

The Court disregarded that evidence and plaintiff's extensive allegations of GWU and PMA's DOES misconduct, concluding that plaintiff had "successfully" "received," "elected," and "collected" "workers' compensation from GW through

29

January 2020." For that conclusion, the Court relied on GWU's extrinsic *reply* exhibits, but denied plaintiff leave to file lodged surreplies. JA506-07, 510.

Further relying on GWU's *reply* exhibits, the Court assumed without any legal or record basis that one of those exhibits showed that GWU had withdrawn is denial that plaintiff was an employee on the accident date, and therefore was not estopped. JA505, 512, 515-16.

## SUMMARY OF ARGUMENT

The district court's dispositive and procedural rulings in issue depart from the record and controlling law. The Court granted PMA dispositive and procedural relief after PMA defaulted, but that relief was precluded by PMA's default. This included summary judgment on Count I, but without judicial power or due process where Count I was not pleaded against PMA and the Court did not give notice of the relief or related "conversion."

The Merits Order granted PMA's motion to dismiss and deemed the two fraud claims "conceded" to PMA under LCvR 7(b). However, PMA did not file a true motion to dismiss. It filed a two-paragraph motion claiming to "adopt" GWU's entire Rule 12(b)(6) motion. Without resolving plaintiff's opposition to the purported adoption or giving notice, the Court "adopted" GWU's Rule 12(b)(6) and summary judgment motions, replies, and exhibits for PMA. The Merits Order

does not disclose that significant fact. But in a footnote, the Court announced it had partially converted PMA's motion because it "consider[ed] matters outside the pleadings." Those unspecified matters were GWU's voluminous extrinsic submissions that the Court relied on without conversion of GWU's motion.

GWU was not entitled to Rule 12(b)(6) or LCvR 7(b) dismissals or summary judgment on Count I. GWU's motions were deficient, including because the University failed to engage the factual allegations against it, support its summary judgment motion with controlling state law, or confine itself to Rule 12(b)(6)'s boundaries. The Court followed GWU's lead, crediting its extrinsic fact claims and documents, granting it summary judgment without consulting substantive state law, and dismissing claims under Rule 12(b)(6) in reliance on extrinsic matters. The Court converted GWU's Rule 12(b)(6) motion as a matter of law under Rule 12(d), but without notice or discovery. This Court, accordingly, reviews the dismissals as grants of summary judgment.

The LCvR 7(b) dismissals of the fraud counts are legally and factually erroneous. The district court was obliged to follow the Federal Rules, including Rule 12(b)(6). LCvR 7(b) was inapplicable on the record, as plaintiff timely filed fulsome oppositions to GWU's Rule 12(b)(6) motion, and a surreply. Plaintiff could not have possibly "conceded" anything to PMA's two-paragraph "adoption" motion.

The Court disposed of all claims against GWU and PMA before any discover occurred or was permitted. This was error and prejudicial to plaintiff.

Finally, the Court erroneously dismissed with prejudice Count I against Aramark. Plaintiff did not request that relief, and the district court departed from the record in stating that the dismissal granted plaintiff's motion.

## ARGUMENT

### I. This Court Should Reverse and Vacate All Relief Granted to PMA While in Default and Direct Entry of Default Against PMA

#### A. Standards of Review

The existence and consequences of PMA's default are legal issues reviewed de novo, as is the district court's interpretation of Rule 6(b). *Curran v. AMI Fireplace Co. Inc.*, 163 Fed. Appx. 714, 718 (10th Cir. 2006) ('To the extent . . . arguments hinge on the interpretation of Rule 6(e), we review them de novo.').

#### B. PMA's Continuing Default Precluded All Relief

The Federal Rules of Civil Procedure 'govern the procedure in all civil actions' without exception. Fed. R. Civ. P. 1. '[F]ederal courts have no more discretion to disregard the . . . mandate [of a Federal Rule] than they do to disregard constitutional or statutory provisions.' *Winston & Strawn, L.L.P. v. McLean*, 843 F.3d 503, 506 (D.C. Cir. 2016) (internal quotations omitted).

'When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the *clerk must* enter the party's default.' Fed. R. Civ. P. 55(a) (emphasis added). *See also* 28 U.S.C. § 956 ('The clerk of each court and his deputies and assistants shall exercise the powers and perform the duties assigned to them by the court.').

Rule 55(a) does not require a plaintiff's motion to trigger default; it 'implies that however a district court ultimately becomes aware of a party's default, the clerk must enter default.' *Peterson v. Syracuse Police Dep't*, 467 F. App'x 31, 33 (2d Cir. 2012). A party that fails to timely defend 'is in default even if that fact is not officially noted.' *See* 10A Fed. Prac. & Proc. Civ. § 2692 (4th ed.); *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1337 (11th Cir. 2014) (same). Entry of default may be set aside only upon a showing of 'good cause,' Fed. R. Civ. P. 55(c), and a 'meritorious defense.' 10A Fed. Prac. & Proc. Civ. § 2692. A defaulting party must also 'secure leave to answer before a responsive pleading will be recognized.' *Id.*

Though ministerial, the clerk's entry of default confers significant substantive rights on plaintiffs. '[U]pon [entry of] default, the well-pleaded allegations of a complaint relating to liability are taken as true. ... The defaulting party cannot contest the fact of his liability unless the entry of default is vacated

under Rule 55(c).' *VLM Food Trading Int'l, Inc. v. Illinois Trading Co.*, 811 F.3d 247, 255 (7th Cir. 2016) (internal quotations omitted).

The district court lacked authority to disregard PMA's default and Rule 55, neutralize plaintiff's motion for default, interfere with the Clerk's performance of her role by granting PMA an extension (within 35 minutes), or effectively set aside the default by granting a motion that PMA had no right to have considered. Fed. R. Civ. P. 55(a), (c); *Winston & Strawn L.L.P.*, 843 F.3d at 506; 10A Fed. Prac. & Proc. Civ. § 2692. The Court materially prejudiced plaintiff by denying her the substantive benefits of default entry. *VLM Food Trading Int'l,* 811 F.3d at 255.

The Court persisted when presented with plaintiff's undisputed evidence – PMA's own emails – that PMA willfully defaulted while monitoring the docket and premised its extension request on the falsehood that PMA 'received' the Complaint on 'August 4.' The Court was also unmoved by PMA's opposition conceding its false account. Over three months later, the Court summarily denied the motion in the Merits Order, omitting from the Merits Opinion the motion's substance and supporting evidence and the fact of PMAs default. The delay further prejudiced plaintiff by withholding notice that PMA was being treated as a non-defaulting party. As throughout the Merits Opinion, the Court's fact omissions obviated the need for explanation, but let on that the Court's rulings were incongruous with the record.

Even if PMA's extension motion was properly before the Court, it should have been denied under Rule 6(b). Post-deadline extensions require both 'good cause' and 'excusable neglect.' Fed. R. Civ. P. 6(b); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 873 (1990) (discretion to extend a deadline arises only "upon motion made" and "for cause shown") (quoting Fed. R. Civ. P. 6(b)).

As the district court explained in an earlier case denying a pro se plaintiff's extension request, the Court was required to determine if excusable neglect had been shown, and in doing so should have considered 'the danger of prejudice to the other party, the length of the delay and its potential impact on judicial proceedings, the reason for the delay (including the movant's control, or lack thereof, with respect to the delay), and whether or not the movant acted in good faith.' *Nwaneri v. Quinn Emanuel Urquhart & Sullivan, LLP*, No. 19-CV-01540 (TNM), 2020 WL 7773391, at *4 (D.D.C. Dec. 30, 2020) (McFadden, J.) (internal quotations omitted).

PMA did not and could not show good cause or excusable neglect. JA175-76. Its claim that it received the Complaint the day it appeared was cursory and implausible. *Id.* at 17. PMA also failed to respond to the original complaint served on June 9, and was served with GWU's extension motion and three Aramark answers—two to the Amended Complaint—with June 27, July 1, and July 22 service dates. JA15, ECF Nos. 6 at 2, 10 at 3, 16 at 36. The district court lacked

discretion under Rule 6(b) to grant the extension without the prerequisite showings, and failed to consider prejudice to plaintiff or any of the factors it earlier identified in *Nwaneri.*

This Court should reverse and vacate all relief granted to PMA while in default and direct the Clerk below to enter default against PMA as of the date the district court became aware of the default. *Peterson*, 467 F. App'x at 33 ; *Carino v. Garland*, 997 F.3d 1053, 1058 (9th Cir. 2021) ('Nunc pro tunc ... signifies that a thing is done now, which shall have the same legal force and effect as if done at the time when it ought to have been done.') (internal quotations omitted).

## II.    Vacatur of PMA Judgment and Reversal of PMA Dismissals

### A. The Judgment is Void

Federal judicial power extends to cases under federal law and specified controversies. U.S. Const., art. III, § 2, cl. 1. Constitutional standing requires a litigant with an injury that is 'fairly traceable' to a defendant's alleged conduct and is 'likely to be redressed by a favorable judicial decision.' *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337-38 (2016), as revised (May 24, 2016) (quoting *Lujan*, 504 U.S. at 561-62).

When courts exceed these constitutional limits, the consequences are severe. '[J]udgments in excess of subject-matter jurisdiction 'are not voidable, but simply void" *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175,

1180 (D.C. Cir. 2013) (quoting *Elliott v. Peirsol's Lessee*, 26 U.S. (1 Pet.) 328 (1828)). Judgments premised 'either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard' are 'void.' *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271 (2010) (such judgments are void under Rule 60(b)(4)).

The existence of a traceable, remediable injury rests on the complaint. Courts are not at liberty to 'conjure up claims never presented.' *Rohrig v. United States Navy*, No. 19-3637, 2020 U.S. App. LEXIS 4245, at *3 (6th Cir. Feb. 11, 2020). Nor may a 'federal district court . . . of its own volition . . . recast the complaint and, without notice, predicate its decision on a theory that was neither pleaded nor tried.' *Rodriguez v. Doral Mortg. Corp.*, 57 F.3d 1168, 1174, 1172 (1st Cir. 1995) (setting aside judgment on an unpleaded claim entered without 'fair notice that . . . the judge would pull one [claim] out from beneath his robe').

The judgment for PMA is void for lack of a 'controversy' and due process. *Bell Helicopter Textron*, 734 F.3d at 1180; *United Student Aid Funds*, 559 U.S. at 271. The Court was not at liberty to rewrite the Complaint or extend its jurisdiction by doing so. *Rodriguez*, 57 F.3d at 1171 (the Federal Rules "shall not be construed to extend . . . the jurisdiction of the United States district courts.") (quoting Fed. R. Civ. P. 82). The Court's February 25, 2025 Memorandum Order confirms the judgment's invalidity, but the Court failed to correct it. This Court should vacate.

**B. The Rule 12(b)(6) and LCvR 7(b) Dismissals for PMA Should Be Reversed**

The Federal Rules do not permit 'adoption' by one party of another's motion. Rule 10(c) provides that '[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion.' Fed. R. Civ. P.10(c). This rule 'contemplates incorporation of statements only from a 'pleading,'' but not from a motion. *Ortiz v. New Mexico*, 550 F. Supp. 3d 1020, 1078 (D.N.M. 2021) (quoting Fed. R. Civ. P. 10(c)). The February 25 Memorandum Order acknowledged that PMA was not permitted to 'adopt' GWU motions under the Federal or Local Rules, but did not correct or review its prior adoptions for PMA. JA538 (citing *Ortiz*, 550 F. Supp. 3d at 1078).[10]

Where permitted, adoptions must also satisfy due process. Adoption 'must be done with a degree of specificity and clarity which would enable the responding party to easily determine the nature and extent of the incorporation.' *Wolfe v. Charter Forest Behavioral Health Sys., Inc.*, 185 F.R.D. 225, 229 (W.D. La. 1999). Moreover, 'adoption by reference of another party's arguments is permitted only to the extent . . . [the Court] can readily apply the proponent's arguments to the adopter's case,' *United States v. Straker*, 800 F.3d 570, 574 n.5 (D.C. Cir. 2015),

---

[10] PMA claimed to "adopt" GWU's opposition to plaintiff's second motion for final judgment. Plaintiff opposed relying on, *e.g.*, *Ortiz.* ECF No. 117 at 2.

and 'cannot occur in a vacuum,' *United States v. Ramírez-Rivera*, 800 F.3d 1 (1st Cir. 2015).

The district court premised its adoptions of GWU's filings for PMA on the factual misstatements that PMA filed a true 'motion to dismiss, joining and adopting GW's positions.' JA489. This alternative rendering of the record had several troubling consequences. First, it precluded discussion of plaintiff's opposition to PMA's adoption motion, which the Court failed to address or mention. Second, it provided scaffolding for the partial 'conversion' of PMA's supposed 'motion to dismiss.' Third, it enabled the Court's statement that it would not consider 'new arguments' in PMA's improper response, suggesting that PMA's two-paragraph motion contained substantive arguments when it did not. Finally, it facilitated the Rule 12(b)(6) and LCvR 7(b) dismissals for PMA that would have been difficult to explain had the Court discussed the actual record.

PMA failed to defend and did not file a Rule 12(b)(6) motion. PMA also failed to explain the applicability to it of any part of GWU's motion that it was not permitted to adopt. Plaintiff did not, and could not have, 'conceded' anything to PMA, let alone her well-pleaded fraud claims and partially the racketeering claim. LCvR 7(b), in any case, does not authorize dismissals of claims as discussed below.

This Court should reverse the seven dismissals for PMA.

III.    **The Court Should Reverse Summary Judgment for GWU and Direct Entry of Partial Summary Judgment for Plaintiff**

   A. **Review and Summary Judgment Standards**

   Summary judgment is reviewed de novo. *Thompson v. Dist. of Columbia*, 832 F.3d 339, 344 (D.C. Cir. 2016). This Court has 'not formally addressed the standard applicable to review of a district court decision to treat an affidavit as a sham,' but has construed *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114 (D.C. Cir. 1991) to 'suggest[] the determination is part of . . . [the] overall review of summary judgment and accordingly subject to de novo review.' *Galvin.*, 488 F.3d at 1030 (citing *Pyramid Sec. Ltd.* 924 F.2d at 1123-24).

   Summary judgment requires that "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.' *Galvin v. Eili Lilly and Co.*, 488 F.3d 1026, 1031 (D.C. Cir. 2007) (quoting Fed. R. Civ. P. 56(c)). 'There is a genuine issue of material fact 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Thompson*, 832 F.3d at 344 (D.C. Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

   Materiality is determined under substantive law, *Galvin*, 488 F.3d at 1031. 'Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law.' *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). A material fact dispute is 'genuine' if the evidence, viewed

40

'through the prism of the substantive evidentiary burden,' is of a 'caliber' and 'quantity' necessary to support liability." *Anderson*, 477 U.S. at 254.

All evidence must be viewed most favorably to the nonmovant, drawing "all reasonable inferences in that party's favor." *Thompson*, 967 F.3d at 344. Rule 56 does not "authorize[] trial on affidavits." *Anderson*, 477 U.S. at 255. "[C]redibility determinations," evidence weighing, and "drawing . . . legitimate inferences from the facts . . . are jury functions, not those of a judge." *Id.*

Only a 'properly supported' motion shifts the burden to the nonmovant to respond with 'affirmative evidence,' even if 'likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery.' *Id.* at 257. "[A]fford[ing] an opportunity to properly support or address [a] fact is '[i]n many circumstances ... the court's preferred first step.'" *Winston & Strawn, L.L.P.*, 843 F.3d at 507 (quoting 2010 Advisory Committee['s] Note to Rule 56(e)).

Summary judgment evidence must be admissible in content; the proponent must demonstrate it capable of submission in admissible form at trial. An affidavit supporting a motion 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.' Fed. R. Civ. P. 56(c)(4). Where an affidavit is 'submitted in bad faith or solely for delay . . . the court — after notice

and a reasonable time to respond — may order the submitting party to pay the

other party the reasonable expenses, including attorney's fees' or hold an

'offending party or attorney' in contempt or subject one or both to 'appropriate

sanctions.' Fed. R. Civ. P. 56(h).

### B. GWU Was Not Entitled to Pre-Discovery Judgment as "a Lawful Self-Insured"

The judgment for GWU on Count I defies summary judgment standards and

basic federal jurisprudence. The Court pronounced GWU "a lawful self-insured"

under the WCA but did not discuss or appear to consult any WCA self-insurance

provision or other substantive state law. JA512-53. It was required to do so to

determine entitle It was required to do so under Rule 56, *Galvin*, 488 F.3d at 1031,

and the *Erie* doctrine. *Gasperini*, 518 at 427.

The Court did not find a lack of genuine disputes of material fact, determine

genuineness considering any substantive evidentiary burden, or view evidence in

the light most favorable to plaintiff. *Anderson*, 477 U.S. at 254; *Thompson*, 967

F.3d at 344. The district court obscured genuine disputes by disregarding the

Complaint, mischaracterizing 13 words requesting discovery in plaintiff's

opposition, and excluding plaintiff's evidence. JA254-65.

Plaintiff did not merely allege "inaccuracies" in GWU's "record keeping and

reporting," or make "'unsubstantiated allegation[s]'" insufficient to "'withstand

summary judgment.'" JA514 (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)). She details a pattern of sustained payroll, headcount, and loss experience misreporting, other facts that the Court simply ignored. JA60-68.  145-46. Plaintiff substantiated her allegations that GWU reported a 2019-2020 payroll to the DOES that was more than $400 million less than the payroll it reported for the same period in its "economic value" report and inaccurately reported its loss experience. JAS38, 42-46.

The Court incorrectly treated GWU's motion as a "properly supported" one that shifted the burden to plaintiff to "produce any evidence suggesting that GW fraudulently obtained insurance" while failing to disclose that no discovery occurred. JA29; *Anderson*, 477 U.S. at 255. Plaintiff was entitled to a "full opportunity" to conduct discovery, particularly as to materials in GWU's possession. *Id.* at 257.

GWU's motion was deficient in all respects, completely lacking substantive law grounds or engagement with the Complaint and dependent on inadmissible and dubious exhibits. The Smith Affidavit should have been stricken. Mr. Smith did not establish personal knowledge by "explicitly" stating he had it. JA513 (citing *Canady v. Erby Elekromedizin GmbH*, 384 F. Supp. 2d 176, 180 (D.D.C. 2005)). *Canady* itself is illustrative. The Court in that case found, and did not summarily state, that the declarant had personal knowledge because he had, among other

43

things, "performed endoscopic surgery more than four thousand times over the last twelve years" and was the author of articles that the movants themselves submitted as evidence. *Canady*, 348 F.Supp. 2d at 181-82.

In stark contrast, the district court had Mr. Smith's own emails requesting and obtaining "help" from GWU's regulator to complete his affidavit just hours before GWU filed it on its last day to file. JA428-49. Mr. Smith's other emails with the DOES – asking if a workers' compensation classification code was a "regulatory report" established lack of competence. JA434. More, the exchange bolstered plaintiff's allegations because Mr. Smith, employed by GWU for then 13 years and assertedly responsible for GWU's self-insured "certification" lacked the basic knowledge of how self-insured status is obtained "in compliance with District of Columbia law." JA130; 128. The district court should have stricken Mr. Smith's affidavit and its exhibits, none of which was authenticated, certified, or admissible under Fed. R. Evid. 803 as a GWU business record. JA422-25. The Court implied that striking was the correct outcome by failing to discuss the evidence supporting it, stating only it "evaluated" the evidence. JA513.

The Court's reliance on the materially redacted insurance policy exhibit and the "Indemnity Bond" was arbitrary at best. A court may not on summary judgment "consider information which was redacted and not provided to the Court in unredacted form." *Hahn v. Portfolio Servicing, Inc.*, 424 F. Supp. 3d 614, 638

(N.D. Ca. 2020). *See also Mimms v. CVS Pharm.*, No. 1:15-cv-00970-TWP-MJ, 2016 U.S. Dist. LEXIS 201748 (S.D. Ind. Jul. 29, 2016) (declining to review redacted documents and explain that filer may file unredacted documents under seal if court's review was sought).

The Merits Opinion uncritically repeats Mr. Smith's conclusion that GWU "posted" an "Indemnity Bond," without addressing plaintiff's arguments or otherwise defining "Indemnity Bond" or "Continuation Certificate," determining if they were the same or fungible, or probing if either was the "surety bond" that was actually in issue. JA513. Nor did the Court identify which of the two single page "Continuation Certificates" was the "Indemnity Bond," or address plaintiff's argument that the unsigned 2018-2019 "certificate" was invalid. JA258.

Mr. Smith's affidavit, partly the testimony of an unwitting DOES employee and GWU's regulator, warranted inquiry under Rule 56(h), and not dignification in federal court. The "lawful self-insured" determination has no legal or evidentiary basis, and should be reversed.

## C. The WCA Applicability Determination is Contrary to Law and Evidence

To support its "immunity" defense, GWU had the burden to show that the WCA applied as a matter of law and the absence or impossibility of genuine dispute on that point. Fed. R. Civ. P. 56(a). As plaintiff argued, the starting point

was the WCA's "coverage" provision, applicable to accidental injuries that "occur if the employee performed work for the employer, at the time of the injury." D.C. Code § 32-1503(a)(1); JA217-19, 262.

Although the employer that filed two dispositive motions claiming "full immunity" under the WCA, GWU failed to address the WCA's applicability or respond to plaintiff's allegation that she was an "invitee" on the accident date. *See generally* GWU MSJ, MTD, JA89-166. Plaintiff had not burden under Rule 56, in the absence of a "properly supported" motion. *Anderson*, 477 U.S. at 257.

The district court acknowledged that plaintiff's material "assertion . . . that her contractual arrangement with GW did not formally obligate her to attend the . . . [adjunct] luncheon" was "undisputed." JA508-09. Plaintiff did not "assert," but filed an affidavit and GWU's business records proving that she was not acting in the course and scope of her part-time employment. JAS1-2, 8-16. The correct result under Rule 56 was to deny GWU judgment. Fed. R. Civ. P. 56(a).

Instead, the Court made merits determinations that plaintiff would not have been injured "but for" her GWU employment, had "successfully" "elected" and "received" workers' compensation and was bound by the WCA, and that GWU was not estopped from claiming immunity because it "withdrew" in the DOES its frivolous claim that plaintiff was not accident did not arise out of and in the

course of employment and that GW informed her directly that it was withdrawing this defense." JA 20-22, 30-31. These determinations contradict undisputed evidence, lack legal grounding, are merits and credibility determinations, and rely exclusively on GWU's *reply* exhibits to "refute" the Complaint after failing to do so in two motions.[11] GWU Br. (No. 24-7090) at 15, 17-18, 20-23.

Plaintiff was not performing work for GWU when injured. D.C. Code § 32-1503(a)(1). GWU's undisputed GWU business records established that plaintiff: (1) completed her teaching duties before the date of her accident; (2) was not required to attend the luncheon; (3) was invited her to the event based on her initial appointment in 2004, and not her teaching in Spring 2019; and (4) was compensated by the course to teach, and not to attend GWU events. JAS1-2, 8-16. The district court supplanted evidence with vague "but for" supposition, but was required to follow the evidence, viewing it the light most favorable to plaintiff. *Thompson*, 967 F.3d at 344.

Relying on GWU's extra-pleading reply exhibits that GWU admitted in this Court that it filed to 'refute' factual allegations, the district court concluded that plaintiff was bound by the WCA because she had 'successfully' 'received,'

---

[11] As discussed in the appeal from the Remand Order, GWU also falsely claimed that its reply exhibits – supporting its Rule 12(b)(6) and "companion" summary judgment motion -- were "public record" to obtain "judicial notice" and evade Rule 12(d). Appellant's Br. (No. 24-7090) at 15, 42.

'elected,' and 'collected' 'workers' compensation from GW through January 2020.' JA506-07 (citing GWU's reply exhibit at ECF No. 32-8). This too was an improper merits determination contrary to plaintiff's allegations and evidence, including GWU and PMA's own documents memorializing that they paid *less than the legal minimum* wage indemnification and acted in September 2021 to increase plaintiff's medical costs by more than $10,000. JAS28, 47-52.

In concluding that plaintiff "successfully" received and elected compensation and that GWU "withdrew" its frivolous employment denial, the Court credited GWU's replies *disputing material facts*, made credibility determinations, and invaded the jury's role. *Anderson*, 477 U.S. at 255. More, the Court's "compensation" and "withdrawal" conclusions are untethered from state law—the WCA governing "compensation" and procedural rules defining "withdrawal." *Galvin*, 488 F.3d at 1031.

The record and law required denial of GWU's motion, because plaintiff's uncontested evidence established that the WCA was inapplicable. For the same reasons, the Court should also have entered partial summary judgment for plaintiff. Fed. R. Civ. P. 56(f) (the court may grant a nonmovant summary judgment where warranted by law and evidence).

IV.    **The "Sham Affidavit" Ruling Should be Reversed With Directions to Correct or Withdraw It**

The district court excluded Plaintiff's affidavit and 22 supporting exhibits based on a "sham affidavit" theory that GWU never substantiated—and that the court supported by distorting both the affidavit and the record. Under *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991), a prior statement will receive "controlling weight unless the shifting party can offer persuasive reasons for believing the supposed correction." As GWU's own business records showed, plaintiff's December 2019 DOES affidavit – filed while still injured—was inaccurate. Pl. Aff. ¶ 51, JAS6. She was not a GWU employee at that time and was never continuously a GWU employee. JAS8-11.

Under *Canady* – that the district court cited to deny striking the Smith Affidavit – "the court uses 'a scalpel, not a butcher knife'" when legitimately striking materials. *Canady*, 384 F. Supp. 2d 176 at 80 (quoting *Perez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001)). Here, the Court used a blow torch, excluding plaintiff's 55-paragraph affidavit and its 22 exhibits, including GWU's business records and DOES self-insurance and claim filings, and PMA and GWU's demand for medical cost refunds. JA509-12. The effect was to clear a path to summary judgment for GWU, without evidentiary obstruction.

49

The Court devoted three pages of a federal judicial decision to the "sham affidavit" fiction, claiming that plaintiff, an attorney, made the "remarkable claim that" she "was not employed at all by GW when she was injured," submitted "radically-changed sworn testimony," and declaring that the Court would "not sanction her attempt to rewrite her employment history after she proceeded through the workers' compensation process, collected benefits under the WCA, and repeatedly represented under penalty of perjury that she was an employee." JA509-11.

A judicial opinion "announce[s] the law to judges, academics, other lawyers, and the interested public, and must 'accurately state the significant facts and relevant rules of law." Federal Judicial Center, <u>Judicial Writing Manual: A Pocket Guide for Judges</u> (2d ed. 2013). The Merits Opinion goes out of its way to misstate significant facts and law, without apparent regard for the consequences of its words. The Court prejudiced plaintiff as an attorney and in the case.

This Court should reverse the "sham affidavit" ruling, restore plaintiff's evidence to the record, and direct the district court to correct or withdraw the opinion's erroneous and prejudicial findings.

### V.    All Rule 12(b)(6) and LCvR 7(b) Dismissals Should be Reversed[12]

### A. Standards of Review

Rule 12(b)(6) dismissals are reviewed de novo, "accepting the plaintiff's factual allegations as true and drawing all inferences in the plaintiff's favor.' *Johnson v. Executive Office for U.S. Attorneys*, 310 F.3d 771, 777 (D.C. Cir. 2002). The Court also reviews de novo the failure to convert GWU's Rule 12(b)(6) motion under Rule 12(d) and reviews the dismissals as 'grant[s] of summary judgment because the district court went beyond the pleadings." *Thompson*, 832 F.3d at 343.

Whether the Court 'improperly applied Local Rule 7(b) in place of the standards prescribed by [a] Federal Rule of Civil Procedure' is a "legal question" reviewed *de novo*. *Winston & Strawn, L.L.P.*, 843 F.3d at 506.

### B. Rule 12(b)(6) Dismissals Without Conversion Under Rule 12(d)

"The complaint is the foundation of a legal action. It is 'the document which embodies the plaintiff's cause of action and it is the vehicle through which he enforces his substantive legal rights." *Unclaimed Prop. Recovery Serv. v. Kaplan*,

---

[12] Plaintiff relies on the record and her arguments above for reversal of all dismissals in favor of PMA. If this Court reviews the PMA dismissals on the merits, the arguments in this section apply to PMA, for whom the Court "adopted" all GWU motions, replies, and extrinsic submissions.

734 F.3d 142, 145 (2d Cir. 2013)  (quoting *Sussman v. Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995)).

A complaint is legally sufficient if it "'contain[s] sufficient factual matter, accepted as true, to "'state a claim for relief that is plausible on its face.'" *Hurd v. D.C., Gov't*, 864 F.3d 671, 678 (D.C. Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when supported by 'sufficient factual allegations that, if proved, would 'allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1128 (D.C. Cir. 2015) and *Iqbal*, 556 U.S. at 678)).

The reviewing court must draw from well-pleaded factual allegations "all reasonable inferences . . . in plaintiff's favor." *Id.* (quoting *Banneker Ventures*, 798 F.3d at 1129). The 'complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible.' *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

Motions to dismiss under Rule 12(b)(6) "'are litigated on the basis of the contents of the complaint,' and not on a defendant's reformulation of a complaint, *Unclaimed Prop. Recovery Serv.*, 734 F.3d at 145 (2d Cir. 2013) (citing *Iqbal*, 556 U.S. at 678), or extrinsic submissions. Fed. R. Civ. P. 12(d). If "matters outside the pleadings are presented to and not excluded by the court, the motion

52

*must* be treated as one for summary judgment under Rule 56. All parties *must* be given a reasonable opportunity to present all the material that is pertinent to the motion.' *Id.* (emphasis added).

The fundamental problem in this case is that the Complaint was not "the foundation of the legal action." *Unclaimed Prop. Recovery Serv.*, 734 F.3d at 145. The Court disregarded most factual allegations, focused on paragraphs pleading counts to suggest plaintiff's allegations were conclusory, and cherry-picked words from oppositions and used them as proxies for the Complaint. [13]

As the Court belatedly confirmed in the Remand Order, it "expressly relied on" GWU's extra-pleading *reply* exhibits "in ruling on its motion to dismiss." JA520. The Court converted GWU's motion to one for summary judgment without

---

[13] JA 492 (relying on MTD Opp'n opposition to dispose of racketeering claim); 492 (citing Compl. ¶¶ 252, 256 pleading racketeering count as "unavailing"); 491, 493, 8 (Compl. ¶ 308, pleading racketeering is "not well-pleaded") 494-96 (disposing of the NIED claim without reference to any allegation); 496-97 (partially quoting Compl. ¶¶ 86, 92 to dismiss two fraud claims as "conceded"); 498 (citing Compl. ¶ 64 alleging GWU's failure to maintain its premises in support of Count I but partially quoting ¶ 353 pleading Count VIII); 498-99 (discussing and quoting MTD Opp'n at 34 stating that Plaintiff did not cast blame on her medical providers and disregarding Compl. ¶ 181 alleging how Plaintiff cast blame on her medical providers); 500-01 (dismissing the abuse of process claim on the merits and citing Compl. ¶¶ 364, 365 pleading Count IX); 501-02 (dismissing Count X for violation for rights (42 U.S.C. § 1983) because Plaintiff failed to plead a "conspiracy" and citing Compl. ¶¶ 369 and 371 pleading Count X but disregarding Compl. ¶¶ 171-96 supporting Count X); 503-18 (discussing Count I against "Defendants" although Count I is not pleaded against PMA).

prior notice or opportunity to "discover and present relevant evidence," while disregarding plaintiff's requests for discovery under Rule 12(d). *Hurd v. District of Columbia*, 864 F.3d 671, 687 (D.C. Cir. 2017). (Rule 12(d)'s "use of the obligatory 'must' makes plain" that conversion is mandatory).

By converting, the Court was also required to decide GWU's motion "under Rule 56's standard, keyed to legal and evidentiary sufficiency . . . rather than the Rule12(b)(6) standard of plausible pleading." *Id.* This Court should reverse all Rule 12(b)(6) dismissals of Counts II-III and VIII-X under Rule 56 standards, with instructions to the district court to open discovery without delay on remand. *Id.*

## C. LCvR 7(b) Dismissals

LCvR 7(b) permits the district court to treat a "motion" as "conceded" if the nonmovant fails to timely file an opposition. The Local Rule is "is a docket-management tool," and not "a tool to subvert the FRCP 12(b)(6) inquiry simply because the court finds the plaintiff's opposition to the motion to dismiss, although pressed, underwhelming." *Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*, 892 F.3d 332, 345 (D.C. Cir. 2018) (internal quotations omitted).

LCvR 7(b) was inapplicable. Plaintiff timely filed a 45-page opposition to GWU's Rule 12(b)(6) motion and lodged a surreply, opposed PMA's two-paragraph "adoption" motion, and moved to strike PMA's untimely "response"

54

making arguments and improper fact claims for the first time. JA204, 279, 342, 409.

To dismiss the two fraud claims as "conceded," the district court partially quoted one sentence on page 32 of plaintiff's opposition, but disregarded pages 20-30 arguing that GWU and PMA's alleged acts, including its payroll underreporting, constituted fraud and racketeering predicate acts. JA12, 225-35. Nevertheless, the Court stated that plaintiff did not "engage any of Defendants' [meaning GWU and PMA] arguments" that she did not plead fraud with particularity as required by Rule 9(b).[14] JA12.

The "conceded" dismissals were not authorized under LCvR 7(b), *Washington All. of Tech. Workers.*, 892 F.3d 345, and rely on a mischaracterization of the record. This Court should reverse dismissals of the fraud claims at Counts IV-V.

## VI.    Dismissal of Count I Against Aramark

On July 31, 2024, plaintiff filed a "Motion to Dismiss <u>With Prejudice</u> Count III of the Amended Complaint Against the Aramark Defendants." ECF No. 119. The one-page motion stated: "Plaintiff does not intend to revive Count III, for

---

[14] Inconsistently, the Court in disposing of the racketeering claim, declined to "reach Defendants' [GWU and PMA's] arguments about whether [Ms.] Abdelhady plead[ed] the predicate acts with sufficient particularity under Rule 9." JA491.

NIED, against Aramark in this or any forum. Accordingly, the Court should enter the attached proposed order dismissing with prejudice Count III, for NIED, against Aramark Services, Inc. and Aramark Management Services Limited Partnership." *Id.* at 1. The proposed order was in accord. ECF No. 119-1.

Six months later, the district court dismissed Count III – *and Count I* – with prejudice against the Aramark defendants, stating it "grants [Ms.] Abdelhady's unopposed motion to dismiss Counts I and III against the Aramark defendants with prejudice. Pl. Mot. Dismiss, ECF No. 119; Pl. Reply Mot. Dismiss, ECF No. 121, at 4 (requesting dismissal of Count I as well)." JA529. The Court ordered Count I dismissed with prejudice, again granting plaintiff's motion. JA540.

This scenario appears to be uncommon. Plaintiff has not located authorities on point. Even under Rule 54(c), the district court's authority to grant unrequested relief not "demanded in pleadings" is limited. Fed. R. Civ. P. 54(c). Unrequested relief is "improper" when "the relief has generally been of a substantially different character from that requested," or prejudicial to the opposing party. *Deanda v. Becerra*, 96 F.4th 750, 768 (5th Cir. 2024) (internal quotations omitted).

Here, the Court prejudiced the movant by granting relief of a substantially different character than clearly requested while noting seemingly unnecessarily that plaintiff "requested dismissal of Count I as well." JA259. This Court should reverse and vacate the dismissal.

## CONCLUSION

The district court's dispositive and procedural rulings constitute a comprehensive departure from the Federal Rules of Civil Procedure and controlling law. The Court granted extensive relief to PMA while it remained in default, usurped judicial power by adjudicating an unpleaded claim, dismissed well-pleaded claims as "conceded" despite plaintiff's substantive oppositions, excluded critical evidence based on GWU's mischaracterizations, and converted motions under Rule 12(d) without notice or opportunity for discovery.

These are not isolated errors but systematic violations of basic procedural protections that denied plaintiff due process. PMA obtained a favorable judgment on a claim never pleaded against it. GWU secured dismissals and summary judgment while avoiding engagement with the Complaint's factual allegations and relying on inadmissible evidence.

The Court's handling of the "sham affidavit" ruling exemplifies this. To avoid evidence, GWU accused plaintiff of professional misconduct but never quoted the supposedly false statement—because no such statement exists. When the district court adopted GWU's construction, it went further, rewriting plaintiff's affidavit to support a finding that had no basis in the record. The Court excluded plaintiff's entire 55-paragraph affidavit and 22 exhibits, including GWU's own records substantiating plaintiff's allegations and positions.

The procedural violations identified are clear legal errors subject to de novo review. The district court lacked authority under Rule 55 to grant relief to a defaulted party, lacked judicial power under Article III to adjudicate non-controversies, and violated mandatory Rule 12(d) conversion requirements and Rule 56.

For the foregoing reasons, this Court should reverse all dispositive rulings in favor of GWU and PMA, vacate the void judgment against PMA, direct entry of default against PMA, restore plaintiff's excluded evidence to the record with instructions to correct the Merits Opinion's "sham affidavit" errors, reverse the dismissal of Count I against Aramark, and remand with instructions for proceedings consistent with the Federal Rules of Civil Procedure.

| Dated: July 29, 2025 | Respectfully submitted, |
|---|---|
| | /s/ Hdeel Abdelhady |
| | Hdeel Abdelhady<br>D.C. Bar No. 483559<br>1717 Pennsylvania Ave., NW, #1025<br>Washington, D.C. 20006<br>(202) 630-2512<br>habdelhady@mapopllc.com<br>*Appellant* |

## CERTIFICATE OF COMPLIANCE

Appellant's brief complies with the page limitation Fed. R. App. P. 32(a)(7)(A) and complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because it contains 12,977 words, excluding those sections set forth in D.C. Cir. Rule 32(e)(1).

This document complies with the typeface requirements of *Id.* R. 32(a)(5) and the type-style requirements of *Id.* R. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 14-point Times New Roman font.

Dated: July 29, 2025

/s/ Hdeel Abdelhady
Hdeel Abdelhady

*Appellant*

## CERTIFICATE OF SERVICE

I certify that on July 29, 2025, I electronically filed and served a copy of the

foregoing paper on the following persons:

Gerard. J. Emig, Esq.
Gleason, Flynn, Emig, & McAffee, Chartered
11 North Washington Street, Suite 400
Rockville, MD 20850
*For The George Washington University*

Robert P. Scanlon, Esq.
Anderson & Quinn, LLC
Adams Law Center
25 Wood Lane
Rockville, MD 20850
*For Aramark Services, Inc. and*
*Aramark Management Services Limited Partnership*

Samuel J. DeBlasis, II, Esq.
DeCaro, Doran, Siciliano, Gallagher & DeBlasis, LLP
17251 Melford Boulevard, Suite 200
Bowie, MD 20715
*For PMA Management Corporation*

/s/ Hdeel Abdelhady
Hdeel Abdelhady
*Appellant-Plaintiff*

60

**ADDENDUM**

**(STATUTES AND REGULATIONS)**

## D.C. Code § 32-1503

*** The Official Code is current through May 15, 2025 ***

***District of Columbia Official Code*** > ***Division V. Local Business Affairs. (Titles 25 — 37)*** > ***Title 32. Labor. (Chs. 1 — 16)*** > ***Chapter 15. Workers' Compensation. (§§ 32-1501 — 32-1545)***

# § 32-1503. Coverage.

(a) Except as provided in subsections (a-1) through (a-3) of this section, this chapter shall apply to:

(1) The injury or death of an employee that occurs in the District of Columbia if the employee performed work for the employer, at the time of the injury or death, while in the District of Columbia; and

(2) The injury or death of an employee that occurs outside the District of Columbia if, at the time of the injury or death, the employment is localized principally in the District of Columbia.

(a-1)No employee shall receive compensation under this chapter and at any time receive compensation under the workers' compensation law of any other state for the same injury or death.

(a-2)This chapter shall not apply if the employee injured or killed was a casual employee except that for the purposes of this chapter, casual, occasional, or incidental employment outside of the District of Columbia by a District of Columbia employer of an employee regularly employed by the employer within the District of Columbia shall be construed to be employment within the District of Columbia.

(a-3)An employee and his employer who are not residents of the District of Columbia and whose contract of hire is entered into in another state shall be exempted from the provisions of this chapter while such employee is temporarily or intermittently within the District of Columbia doing work for such nonresident employer, if such employer has furnished workers' compensation insurance coverage under the workers' compensation or similar laws of such other state, so as to cover such employee's employment while in the District of Columbia. The benefits under this chapter or similar laws of such other state shall be the exclusive remedy against such employer for any injury, whether resulting in death or not, received by such employee while working for such employer in the District of Columbia.

(b) Every employer subject to this chapter shall be liable for compensation for injury or death without regard to fault as a cause of the injury or death.

(c) In the case of an employer who is a subcontractor, the contractor shall be liable for and shall secure the payment of such compensation to employees of the subcontractor unless the subcontractor has secured such payment.

(d) Liability for compensation shall not apply where injury to the employee was occasioned solely by his intoxication or by his willful intention to injure or kill himself or another.

(e) Repealed.

## History

(July 1, 1980, D.C. Law 3-77, § 4,  27 DCR 2503; Mar. 6, 1991, D.C. Law 8-198, § 2(b),  37 DCR 6890; May 8, 1996, D.C. Law 11-117, § 18(b),  43 DCR 1179; Apr. 21, 2023, D.C. Law 24-344, § 16,  70 DCR 635.)

§ 32-1503. Coverage.

Copyright © 2025 All rights reserved.

---

**End of Document**

## D.C. Code § 32-1504

*** The Official Code is current through May 15, 2025 ***

*District of Columbia Official Code    >  Division V. Local Business Affairs. (Titles 25 — 37)    >    Title 32. Labor. (Chs. 1 — 16)    >    Chapter 15. Workers' Compensation. (§§ 32-1501 — 32-1545)*

# § 32-1504. Exclusiveness of liability and remedy.

**(a)** The liability of an employer prescribed in *§ 32-1503* shall be exclusive and in place of all liability of such employer to the employee, his legal representative, spouse or domestic partner, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law on account of such injury or death.

**(b)** The compensation to which an employee is entitled under this chapter shall constitute the employee's exclusive remedy against the employer, or any collective-bargaining agent of the employer's employees and any employee, officer, director, or agent of such employer, insurer, or collective-bargaining agent (while acting within the scope of his employment) for any illness, injury, or death arising out of and in the course of his employment; provided, that if an employer fails to secure payment of compensation as required by this chapter, an injured employee, or his legal representative in case death results from the injury, may elect to claim compensation under this chapter, or to maintain an action at law for damages on account of such injury or death. In such action the defendant may not plead as a defense that injury was caused by the negligence of a fellow servant, nor that the employee assumed the risk of his employment, nor that the injury was due to the contributory negligence of the employee.

**(c)** The furnishing of, or failure to furnish, insurance consultation services related to, in connection with or incidental to an applicable policy of insurance shall not subject the insurer, its agent or employees undertaking to perform such services to liability for damages from injury, death or loss occurring as a result of any act of omission in the course of such services.

**(d)** This section shall not apply:

**(1)** If the injury, loss or death occurred during the actual performance of consultation services and was caused by the active negligence of the carrier, its agent or employees which was the proximate cause of the injury, death or loss; or

**(2)** To any consultation services required to be performed under the provisions of a written service contract not incidental to an applicable policy of insurance.

## History

(July 1, 1980, D.C. Law 3-77, § 5,  27 DCR 2503; Sept. 12, 2008, D.C. Law 17-231, § 31(b),  *55 DCR 6758*.)

District of Columbia Official Code
Copyright © 2025 All rights reserved.

**End of Document**

## D.C. Code § 32-1534

*** The Official Code is current through May 15, 2025 ***

*District of Columbia Official Code* **>** *Division V. Local Business Affairs. (Titles 25 — 37)* **>** *Title 32. Labor. (Chs. 1 — 16)* **>** *Chapter 15. Workers' Compensation. (§§ 32-1501 — 32-1545)*

# § 32-1534. Security for payment of compensation.

**(a)** Every employer shall secure the payment of compensation under this chapter: (1) by insuring and keeping insured the payment of such compensation with any stock company or mutual company or association, or with any person or fund, while such person or fund is authorized: (A) under the laws of the United States, the District of Columbia, or of any state, to insure workers' compensation; and (B) by the Mayor to insure payment of compensation under this chapter; or (2) by furnishing satisfactory proof to the Mayor of his financial ability to pay such compensation and receiving an authorization from the Mayor to pay such compensation directly. The Mayor may, as a condition to such authorization, require such employer to deposit with the District of Columbia Treasurer either an indemnity bond or securities (at the option of the employer) of a kind and in an amount determined by the Mayor, and subject to such conditions as the Mayor may prescribe, which shall include authorization to the Mayor, in case of default, to sell any such securities sufficient to pay compensation awards or to bring suit upon such bonds, to procure prompt payment of compensation under this chapter. Any employer securing compensation in accordance with the provisions of this subsection shall be known as a self-insurer.

**(b)** In granting authorization to any carrier to insure payment of compensation under this chapter the Mayor may take into consideration the recommendation of any District authority having supervision over carriers. Any carrier so authorized by the Mayor shall maintain a representative in the District of Columbia who can fulfill all of the obligations of the carrier under this chapter and who shall maintain a file of all active claims being serviced by the carrier in the District of Columbia. The Mayor may suspend or revoke the authorization of any carrier to insure payment of compensation under this chapter for good cause shown after a hearing at which the carrier shall be entitled to be heard in person or by counsel and to present evidence. No suspension or revocation shall affect the liability of any carrier already incurred.

## History

(July 1, 1980, D.C. Law 3-77, § 35,  27 DCR 2503.)

District of Columbia Official Code
Copyright © 2025 All rights reserved.

## D.C. Code § 32-1540

*** The Official Code is current through May 15, 2025 ***

*District of Columbia Official Code*     >     Division V. Local Business Affairs. (Titles 25 — 37)     >     Title 32. Labor. (Chs. 1 — 16)     >     Chapter 15. Workers' Compensation. (§§ 32-1501 — 32-1545)

# § 32-1540. Special fund.

**(a)** There is established in the Treasury of the District of Columbia a special fund for the purpose of making payments in accordance with the provisions of §§ 32-1507(c), 32-1507(e), 32-1508(6), and 32-1519(b). Such fund shall be administered by the Mayor.

**(b)** The Mayor shall be the custodian of the special fund, and all moneys and securities in such fund shall be held in trust by the Mayor and shall not be used for purposes other than those provided by this chapter. The Mayor may invest any portion of the fund which, in the opinion of the Mayor, is not needed for current requirements in bonds or notes of the United States or any federal land bank; provided, that such investments are made pursuant to the Financial Institutions Deposit and Investment Act of 1997.

**(c)** Neither the District of Columbia nor the Mayor shall be liable in respect of payments authorized under §§ 32-1507(c), 32-1507(e), 32-1508(6) and 32-1519(b) in any amount greater than the money or property deposited in or belonging to such fund.

**(d)** Payments into such fund shall be made as follows:

**(1)** Each employer shall pay $5,000 as compensation for the death of an employee of such employer resulting from injury where the Mayor determines that there is no person entitled under this chapter to compensation for such death;

**(2)** All amounts collected as fines and penalties under the provisions of this chapter shall be paid into such fund; and

**(3)** The total assessment amount shall be allocated between self-insured employers and insured employers based on paid losses for the fiscal year preceding the year in which the assessment is based. The method of assessing self-insured employers shall be based upon paid losses. The method of assessing insured employers shall be a surcharge based on premium as set forth in this subsection. The portion of the total aggregate assessment to be collected from self-insured employers shall be equal to that proportion of the total paid losses during the preceding fiscal year, which the total paid losses of all self-insured employers bore to the total paid losses made by all self-insured employers and insurers on behalf of all insured employers during the preceding fiscal year. The portion of the total aggregate assessment that shall be collected from insured employers shall be equal to that proportion of total paid losses during the preceding fiscal year, which the total paid losses made on behalf of all insured employers bore to the total paid losses made by all self-insured employers and insurers on behalf of all insured employers during the preceding fiscal year.

**(4)** Any employer which becomes self-insured shall be assessed as if it were insured for 24 months after conversion. The new self-insured employer shall be assessed on the basis of premium. The premium basis shall be equal to its premium for the policy period immediately preceding conversion to be self-insured, multiplied by the percentage change in the self-insured's payroll. The payroll measurement period shall be the fiscal year immediately preceding conversion and the subsequent 2 fiscal years.

§ 32-1540. Special fund.

**(5)** On or after September 1, 1999, and annually thereafter, the Mayor shall notify insurers of the premium surcharge rate to be effective for policies written or renewed on and after October 1, 1999, and annually thereafter. The Mayor shall notify self-insured employers, at the same time, of the amount to be assessed against self-insured employers for the following fiscal year. The assessment against self-insurers and the surcharge rate applicable to policies of insured employers, together with amounts generated by paragraphs (1) and (2) of this subsection, shall be sufficient to generate revenue needed to satisfy obligations to the Special Fund. Should the Mayor subsequently determine that the assessments are insufficient to meet the Special Fund's obligations during a fiscal year, the Mayor may assess self-insurers and insured employers to cover any anticipated deficiency, based upon the allocation method set forth in this subsection. Self-insured employers and insurers, on behalf of their policyholders, shall remit any emergency assessment within 30 calendar days of receipt of notice from the Mayor.

**(6)** Every workers' compensation insurer shall collect, from each of its policyholders, an amount equal to the insured employers' assessment through a surcharge based on premium. These assessments shall include any amounts paid by insurers on behalf of their policyholders to cover an emergency assessment by the Mayor during the previous fiscal year. Assessments when collected shall not constitute an element of loss for the purpose of establishing rates for workers' compensation insurance but, for the purpose of collection, shall be treated as separate costs imposed upon insured employers. The total of the assessment imposed by this subsection shall be stated as a separate cost on an insured employer's policy, or on a separate document submitted to the insured employer, and shall be identified as the "Workers' Compensation Policyholder Surcharge." Each assessment shall be shown as a percentage of the total workers' compensation policyholder premium. The premium surcharge shall be excluded from the definition of premiums for all purposes, including computation of agents' commissions or premium taxes.

**(7)** Insurers and self-insurers shall forward to the Special Fund all amounts collected pursuant to this section. These collections shall be for the administration of the Special Fund and shall not be part of the General Fund of the District of Columbia. Any balance remaining at the end of any fiscal year shall not revert to the General Fund and shall be used exclusively to offset any Special Fund assessment required in the next immediate fiscal year.

**(e)** The special fund shall be audited annually by the Department of Employment Services. The Director of the Department of Employment Services shall file an audited financial report with the Council by March 1st detailing the financial status of the fund as of the end of the preceding fiscal year, including the fund's operation, cash flow, and changes in capital and surplus, using standard accounting principles.

**(f)** All civil penalties provided for in this chapter shall be collected by civil suit brought by the Mayor.

## History

(July 1, 1980, D.C. Law 3-77, § 41, 27 DCR 2503; Mar. 18, 1998, D.C. Law 12-56, § 3, *44 DCR 6933*; Apr. 16, 1999, D.C. Law 12-229, § 2(j), *46 DCR 891*; Dec. 7, 2004, D.C. Law 15-205, § 1102(c), *51 DCR 8441*.)

District of Columbia Official Code
Copyright © 2025 All rights reserved.

**End of Document**

## *D.C. Code § 32-1541*

*** The Official Code is current through May 15, 2025 ***

**District of Columbia Official Code**     **>**     Division V. Local Business Affairs. (Titles 25
— 37)     **>**     **Title 32. Labor. (Chs. 1 — 16)**     **>**     Chapter 15. Workers'
Compensation. (§§ 32-1501 — 32-1545)

# § 32-1541. Administration fund.

**(a)**

**(1)** There is established in the Treasury of the District of Columbia a fund to provide for the payment of all expenses to administer the provisions of this chapter. The fund shall be administered by the Mayor.

**(2)** The Mayor shall determine, for fiscal years commencing on or after October 1, 1999, the cost of administration of this chapter for each fiscal year and shall prorate and assess the costs of administration as provided in subsections (d) and (f) of this section. The cost of administration shall include any expenses that have been incurred, will be incurred, or that will accrue during the fiscal year.

**(3)** The Mayor shall determine, in each fiscal year commencing on or after September 30 of the fiscal year in which the Workers' Compensation Amendment Act of 1998 becomes effective, prior to the commencement of the fiscal year, the cost of administration of this chapter. The cost of administration shall include any expenses to be incurred or that will accrue during the fiscal year.

**(b)** The provisions of *§ 32-1540(b)* and (e) shall apply to the fund established pursuant to subsection (a)(1) of this section.

**(c)** The Mayor shall determine, at the end of each fiscal year, the cost of the administration of this chapter. The cost of administration shall include any expenses to be incurred or which will accrue during the fiscal year.

**(d)** The total amount of costs to administer this chapter, shall be pro rated among the carriers and self-insurers authorized to insure pursuant to *§ 32-1534.* The assessment base shall be the total amount of compensation and medical payments that carriers and self-insurers have paid pursuant to this chapter during the preceding fiscal year; provided, however, beginning with the fiscal year commencing on or after October 1, 1999, the Mayor shall have the authority to assess each carrier or self-insured a minimum annual amount of $1,000.

**(e)** The assessment for each carrier and self-insurer for the preceding fiscal year shall be redetermined, subsequent to each fiscal year, based upon the actual total amount of compensation and medical payments paid and the administrative costs incurred that year. Adjustments for differences between the beginning year assessment and the year end actual determination, if any, shall be made to the next ensuing assessment.

**(e-1)** If the Mayor fails to properly determine or redetermine the costs of administering this chapter or fails to properly determine or redetermine the assessment rate or assessments under this section, the assessment rates and assessments shall remain valid and no cause of action shall lie for the Mayor's failure.

**(f)** The Mayor shall assess each carrier and self-insurer for its pro rata share of the total amount of costs to administer this chapter in the fiscal year pursuant to this section, and shall give written notice by certified or registered mail to each carrier or self-insurer of the assessment against it.

**(g)**

**(1)** Assessments shall be paid within the time prescribed by the Mayor.

§ 32-1541. Administration fund.

(2)  For a period not to exceed 12 months following April 16, 1999, the Mayor may permit payment of the assessment of each carrier or self-insured in quarterly installment payments.

(h)  If a deficit is projected to occur in the administration of the fund created pursuant to subsection (a) of this section, prior to the end of the fiscal year, the Mayor is authorized to implement an emergency assessment in an amount deemed necessary to avoid the deficit. Self-insurers and carriers, on behalf of their policyholders, shall remit the emergency assessment within 30 calendar days of receipt of the assessment.

(i)  The Mayor is authorized to promulgate rules deemed necessary or appropriate to carry out the purposes of this section, including provisions for making and preserving appropriate records, paying of assessments, inspecting these records, and the submission by carriers and self-insurers of reports prescribed by the Mayor.

(j)  If a carrier or self-insurer fails to pay the assessment referred to in subsection (f) or (h) of this section, or to make and preserve records in the form and manner required by the Mayor, to file a report in the form and manner required by the Mayor, or to allow the Mayor to inspect records required by rules issued pursuant to this section, the Mayor may suspend or revoke the authorization of a carrier to insure for workers' compensation or a self-insurer to act as a self-insurer pursuant to this chapter.

(k)  The administration fund shall be audited annually by the Department of Employment Services. The Director of the Department of Employment Services shall file an audited financial report with the Council by March 1st detailing the financial status of the fund as of the end of the preceding fiscal year, including the fund's operation, cash flow, and changes in capital and surplus, using standard accounting principles.

## History

(July 1, 1980, D.C. Law 3-77, § 42,  27 DCR 2503; Apr. 16, 1999, D.C. Law 12-229, § 2(k),  *46 DCR 891*; Dec. 7, 2004, D.C. Law 15-205, § 1102(d),  *51 DCR 8441*; Sept. 24, 2010, D.C. Law 18-223, § 2193,  *57 DCR 6242*.)

District of Columbia Official Code
Copyright © 2025 All rights reserved.

**End of Document**

## [CDCR 7-217](#)

This file includes all regulations adopted and published through D.C. Register, Vol. 72, Issue 28, July 11, 2025

*DC - Code of D.C. Municipal Regulations      >      TITLE 7. EMPLOYMENT BENEFITS* > *CHAPTER 2. PRIVATE SECTOR WORKERS' COMPENSATION PROGRAM*

# 7-217. SELF-INSURANCE.

**217.1** An employer who desires to be a self-insurer may apply for authorization in accordance with this section and in the manner prescribed by the Office.

**217.2** Under § 35(a)(2) of the Act (§ 36-334(a)(2), D.C. Code, 1981 ed.), any employer who desires to be a self-insurer shall furnish satisfactory proof to the Office that he or she has met the following requirements:

**(a)** Secured or has sufficient financial resources to meet all obligations in regard to its potential liability under the Act;

**(b)** Obtained adequate excess or catastrophic loss insurance or has otherwise made adequate financial arrangements for the losses:

**(c)** Made adequate arrangements to provide promptly to its employees all necessary compensation and medical care required by the Act;

**(d)** Made a deposit of security (negotiable securities, surety bond or other financial bond) in the amount and form prescribed by the Office; and

**(e)** Agreed to carry out all requirements of the Act and this chapter.

**217.3** An employer who applies for the status of self-insurer shall secure the insurance coverage required by the Act until such time as authorization is issued by the Office.

**217.4** Application for self-insurance shall be made in a manner prescribed by the Office and shall contain at least the following information:

**(a)** A statement of the amount of the employer's payroll for the preceding twelve (12) month period;

**(b)** A statement of the average number of employees engaged in employment within the purview of the Act, or similar provisions of prior law, in the preceding twelve (12) month period;

**(c)** A statement of the number and kinds of injuries to employees resulting in disability of more than three (3) days' duration, or in death, during each of the preceding three (3) years;

**(d)** An itemized statement of the assets and liabilities of the employer;

**(e)** A statement describing the facilities maintained or the arrangements made for the medical and hospital care of injured employees;

**(f)** A statement describing the provisions and maximum amount of any excess or catastrophic insurance;

**(g)** Signature of the applicant over the typewritten name, and if the applicant is not an individual, signature of a duly authorized officer indicating official title;

**(h)** Sworn oath of the applicant and, where appropriate, the corporate seal of the applicant; and

**(i)** A statement pertaining to the proposed processing of claims. If claims are proposed to be processed "in house", a statement shall be submitted showing the qualifications of those individuals who will process claims. If a self-insured service organization is to be used, a profile of the organization

7-217. SELF-INSURANCE.

shall be submitted showing its experience in the administration of claims in general and specifically under workers' compensation laws, both state and federal.

**217.5** The application shall be filed with the Office at the time and place and in the manner prescribed by the Office.

**217.6** In addition to the application requirements set forth in § 217.4, the Office may require an applicant for self-insurance status to submit further financial or other information as it deems necessary.

**217.7** In evaluating the ability of an employer to be a self-insurer, including the amount and form of any security to be deposited with the Office, the Office shall consider the following:

**(a)** The financial standing of the employer;

**(b)** The nature of the work in which the employer is engaged;

**(c)** The degree of hazard to which employees are exposed;

**(d)** The amount of the employer's payroll;

**(e)** The provisions for excess insurance against catastrophic loss; and

**(f)** Any other data submitted by the applicant or required by the Office.

**217.8** Annually and at any other time as the Office may require or prescribe, each self-insurer shall submit each of the following reports:

**(a)** A sworn itemized statement of the self-insurer's assets and liabilities, or a balance sheet;

**(b)** A sworn statement showing by classifications the payroll of employees of the self-insurer who are engaged in employment within the purview of the Act or similar provisions of prior law; and

**(c)** A sworn statement covering the preceding twelve (12) month period, listing all death and injury cases which have occurred during the period, together with a report of the status of all outstanding claims.

**217.9** Whenever it is deemed necesary, the Office may, after reasonable notice, inspect or examine the books of account, records, and other papers of a self-insurer at the self-insurer's place of business for the purpose of verifying any financial statement submitted to the Office by the self-insurer or verifying any other information furnished to the Office in any report required by the Act or this chapter.

**217.10** Each self-insurer shall permit the Office or its duly authorized representative to make an inspection or examination as the Office shall require. In lieu of this requirement the Office may, in its discretion, accept the report of a certified public accountant.

**217.11** Applicants for self-insurance, as a condition precedent to receiving authorization to be a self-insurer, shall give security for the payment of compensation and the discharge of all other obligations under the Act in the amount and form prescribed by the Office.

**217.12** The amount of security required by the Office shall be the amount that the Office deems reasonable, necessary, and sufficient to secure performance by the applicant of all obligations imposed upon an employer by the Act. Additions to the amount of security may be required at any time in the discretion of the Office.

**217.13** Only surety companies approved by the Treasurer of the District of Columbia may act as sureties on any security for obligations under the Act.

**217.14** Applications for self-insurance shall, as a condition precedent to receiving authorization to be a self-insurer, execute and file an undertaking in a manner prescribed by the Office.

**217.15** Applicants shall agree in the undertaking to do the following;

7-217. SELF-INSURANCE.

**(a)** To pay when due, as required by the Act, all compensation payable on account of injury or death of any of its employees injured within the purview of the Act;

**(b)** To furnish where necessary, medical, surgical, hospital and other attendance, treatment, care, and vocational rehabilitation as required by the Act;

**(c)** To give or deposit with the Office security in the amount and form required by the Office;

**(d)** To authorize the Office to proceed against, sell or otherwise collect from the security if the employer fails to meet its obligations under the Act;

**(e)** To timely pay the appropriate share of the cost of administration of the Act; and

**(f)** To maintain excess insurance coverage or other catastrophic loss security as the Office shall prescribe.

**217.16** No initial authorization as a self-insurer shall be granted for a period in excess of twelve (12) months and the expiration date thereof shall fall on the thirtieth (30th) day of September.

**217.17** A self-insurer who has made continuing deposit of security as prescribed by the Office and who has filed the appropriate financial and other reports as required by the Office, shall be deemed to have reapplied for self-insurance for the following twelve (12) month period if the employer does not inform the Office to the contrary in writing on or before August 1, preceding the September 30th expiration date.

**217.18** The Office may, for good cause shown, suspend or revoke the authorization of any self-insurer.

**217.19** The occurrence of any one of the following events shall constitute good cause to suspend or revoke the authorization of a self-insurer:

**(a)** Failure by a self-insurer to comply with any provision or requirement of the Act or of this chapter or with any lawful order or communication of the Office;

**(b)** Failure or insolvency of the surety on the indemnity bond; or

**(c)** Impairment of financial responsibility.

**217.20** A self-insurer who desires to terminate the status of a self-insurer and obtain a refund of the deposited security shall file with the Office a sworn statement indicating the following:

**(a)** All outstanding liabilities for compensation;

**(b)** All pending claims for compensation;

**(c)** All accidents that have occurred during the period up to three (3) years prior to the date of the statement; and

**(d)** Evidence of insurance coverage as required by the Act and § 214 and § 215 of this chapter.

**217.21** The Office shall return the deposited security (or the balance thereof) to the employer only after all claims and liabilities have been adjudicated and paid or the Office determines that adequate arrangements for the payment have been made.

# Statutory Authority

**STATUTORY AUTHORITY:**

 Unless otherwise noted, the authority for this chapter is § 3 (a) of the District of Columbia Workers' Compensation Act of 1979, effective July 1, 1980, D.C. Law 3-77, D.C. Official Code *§ 32-1502* (a) (2001) (WCA); section 2344 of the District of Columbia Comprehensive Merit Personnel Act of 1978 (CMPA), effective March 3, 1979, D.C. Law 2-

7-217. SELF-INSURANCE.

139, D.C. Official Code *§ 1-623.44* (2001) (collectively, the Acts); Part C of Reorganization Plan No. 3 of 1980 (effective January 10, 1981); and Mayor's Order 82-126 (effective June 24, 1982)

## History

**SOURCE:**

 In effect as of January 1986.

CODE OF D.C. MUNICIPAL REGULATIONS

Copyright © 2025 Matthew Bender & Company, Inc. a member of the LexisNexis Group. All rights reserved.CODE OF D.C. MUNICIPAL REGULATIONS Copyright (c) Matthew Bender & Company, Inc. a member of the LexisNexis Group. All rights reserved.

**End of Document**

## CDCR 7-231

This file includes all regulations adopted and published through D.C. Register, Vol. 72, Issue 28, July 11, 2025

***DC - Code of D.C. Municipal Regulations    >    TITLE 7. EMPLOYMENT BENEFITS > CHAPTER 2. PRIVATE SECTOR WORKERS' COMPENSATION PROGRAM***

# 7-231. SPECIAL FUND.

**231.1**  The Associate Director for the Office of Workers' Compensation, or his or her designee, shall be the custodian of the Special Fund and, in administering the provisions of § 41 of the Act (§ 36-340, D.C. Code, 1981 ed.), shall observe the customary duties and obligations of a fiduciary.

**231.2**  For purposes of this section, the term "award" means any final order issued under § 21 of the Act (§ 30-320, D.C. Code, 1981 ed.) finding the employer liable for any of the following:

   **(a)**  Compensation benefits under § 9 of the Act (§ 36-308, D.C. Code, 1981 ed.);

   **(b)**  Death benefits under § 10 of the Act (§ 36-309, D.C. Code, 1981 ed.);

   **(c)**  Supplemental allowances under § 7 of the Act (36-306, D.C. Code, 1981 ed.);

   **(d)**  Medical services and supplies under § 8 of the Act (§ 36-307, D.C. Code, 1981 ed.); and

   **(e)**  Attorneys' fees under § 31 of the Act (§ 36-330, D.C. Code, 1981 ed.).

**231.3**  The term "award" shall not apply to any order finding an employer in violation of the discriminatory discharge provision of Section 43 of the Act (D.C. Code § 36-342).

**231.4**  Under § 41(a) of the Act (§ 36-340(a), D.C. Code, 1981 ed.), payments may be made from the Special Fund for any of the following:

   **(a)**  For the provision of vocational rehabilitation services ordered by the office under § 8(c) of the Act (36-307(c), D.C. Code, 1981 ed.);

   **(b)**  For the expenses of medical examinations required by the Office under § 8(e) of the Act (§ 36-307(e), D.C. Code, 1981 ed.);

   **(c)**  For supplemental compensation benefits due an employee whose injury occurred prior to April 16, 1999 and is a second injury under Section 9(f) of the Act (D.C. Code § 36-308(d));

   **(d)**  For the satisfaction of a judgment for an award, including reasonable medical expenses and attorney fees under § 20(b) of the Act (§ 36-319(b), D.C. Code, 1981 ed.).

   **(e)**  For Utilization Review.

**231.5**  The Office may pay from the Special Fund, the medical expenses of an examination ordered by the Associate Director, pursuant to § 8(e) of the Act (36-307(e), D.C. Code, 1981 ed.) and § 212.19, only after making an unsuccessful demand upon the self-insured employer or the carrier to pay the expenses and only after determining either that the carrier or employer is insolvent or that it would further the interest of justice to make the payment from the Special Fund.

**231.6**  An employer liable for compensation payments in connection with a second injury may file with the Associate Director, an application for an order finding the Special Fund liable for supplemental compensation payments under § 9(f) of the Act (§ 36-308(d), D.C. Code, 1981 ed.).

7-231. SPECIAL FUND.

**231.7** All issues of an employer's liability and the extent and nature of compensation payable under an approved claim shall be in final disposition prior to filing a request for relief for the second injury from the Special Fund.

**231.8** Upon the filing of an application for an order finding the Special Fund liable for supplemental compensation benefits, the Associate Director shall investigate the matter to ensure, among other things, that there are no substantial matters in dispute and that the employer has made or is making appropriate payments to the disabled employee or beneficiary.

**231.9** Within sixty (60) days following the filing of the application, the Associate Director shall issue an order which determines the liability of the Special Fund for compensation benefits; Provided, that the Associate Director may order the submission of additional evidence.

**231.10** If additional evidence is ordered to be submitted pursuant to § 231.9, the Associate Director shall issue an order within thirty (30) days of receipt of the evidence. The order shall state the reasons for its determination.

**231.11** An employer aggrieved by an adverse determination, pursuant to § 231.8, may request, within thirty (30) days, a formal hearing pursuant to § 220 of this chapter.

**231.12** An employer who has obtained an order finding the Special Fund liable for compensation payments for a second injury disability may file, on a quarterly basis, a request for reimbursement for compensation payments.

**231.13** The request for reimbursement shall be in a manner prescribed by the Associate Director and shall be accompanied by invoices, payment records, cancelled checks or such other documents as the Associate Director may require.

**231.14** The Associate Director may require any additional proof as he or she deems necessary to complete an investigation of the reimbursement request.

**231.15** Upon completion of his or her review and within thirty (30) days of the receipt of the request for reimbursement, the Associate Director shall disburse from the Special Fund the payments to which he or she finds the employer entitled.

**231.16** Under § 20(b) of the Act (§ 36-319(b), D.C. Code, 1981 ed.), the Associate Director may make from the Special Fund, payments upon any award if the employer is insolvent and had defaulted. Special Fund payments may provide for necessary medical, surgical or other treatment required by § 8 of the Act (§ 36-307, D.C. Code, 1981 ed.)

**231.17** A claimant, beneficiary or attorney who has obtained an award and a judgment based thereon may apply for Special Fund payments pursuant to § 20 of the Act (§ 36-319, D.C. Code, 1981 ed.).

**231.18** The application for Special Fund payments pursuant to § 231.17 shall be filed with the Associate Director within twenty-four (24) months of the date of the judgment together with a statement of the efforts made to enforce the judgment under § 23(c) of the Act (§ 36-322(c), D.C. Code, 1981 ed.) and copies of the award, the declaratory supplementary default order, any mandatory injunction, and a certified copy of the judgment.

**231.19** Upon receipt of the application for Special Fund payment, the Associate Director shall investigate the allegations contained in the application, the financial position of the employer or carrier, and such matters which the Associate Director deems necessary to a just decision.

**231.20** Within twenty (20) working days of receipt of the application for Special Fund payment pursuant to § 231.17, the Associate Director shall issue an order granting or denying the relief sought in the application.

**231.21** In investigating any request for payments from the Special Fund under this section, the Associate Director is authorized under § 30(a) of the Act (§ 36-329(a), D.C. Code, 1981 ed.) to issue any orders, subpoenas, interlocutories, or other process to any person as may be necessary to discharge his or her duties.

7-231. SPECIAL FUND.

**231.22**  The total assessment amount shall be allocated between self-insured employers and insured employers based on paid losses for the fiscal year preceding the year in which the assessment is based.

**231.23**  The method of assessing self-insured employers shall be based upon paid losses. The method for assessing insured employers shall be a surcharge based upon a premium as set forth in the subsection.

**231.24**  The portion of the total aggregate assessment to be collected from self-insured employers shall be equal to that proportion of the total paid losses during the preceding fiscal year, which the total paid losses of all self-insured employers and insurers on behalf of all insured employers during the preceding fiscal year.

**231.25**  The portion of the total aggregate assessment that shall be collected from insured employers shall be equal to that proportion of the total paid losses during the preceding fiscal year, which the total paid losses made on behalf of all insured employers bore to the total paid losses made by self-insured employers and insurers on behalf of all insured employers during the preceding fiscal year.

**231.26**  The method for determining the total paid losses and the proportions shall be based upon the quarterly reports required pursuant to subsection 233.12 of this Chapter.

**231.27**  On or after September 1st each year, the Office shall notify each self-insured employer of its assessed prorata share and shall notify insurers of the premium surcharge rate applicable to policies of insured employees.

**231.28**  Each self-insured's assessment shall be payable upon receipt of the notice of assessment and be paid no later than thirty (30) days after receipt of the assessment notice.

**231.29**  At the end of each quarter, each insurer shall submit to the Office, an amount equal to the premium surcharge collected from its policyholders during that quarter. The payment shall be submitted no later than thirty (30) days after each quarter ends.

## Statutory Authority

**STATUTORY AUTHORITY:**

 Unless otherwise noted, the authority for this chapter is § 3 (a) of the District of Columbia Workers' Compensation Act of 1979, effective July 1, 1980, D.C. Law 3-77, D.C. Official Code *§ 32-1502* (a) (2001) (WCA); section 2344 of the District of Columbia Comprehensive Merit Personnel Act of 1978 (CMPA), effective March 3, 1979, D.C. Law 2-139, D.C. Official Code *§ 1-623.44* (2001) (collectively, the Acts); Part C of Reorganization Plan No. 3 of 1980 (effective January 10, 1981); and Mayor's Order 82-126 (effective June 24, 1982)

## History

**SOURCE:**

 In effect as of January 1986; as amended by: ERRATA published at    (April 18, 1986); and Final Rulemaking published at  *47 DCR 6454 (August 11, 2000).*

CODE OF D.C. MUNICIPAL REGULATIONS

Copyright © 2025 Matthew Bender & Company, Inc. a member of the LexisNexis Group. All rights reserved.CODE OF D.C. MUNICIPAL REGULATIONS Copyright (c) Matthew Bender & Company, Inc. a member of the LexisNexis Group. All rights reserved.

**End of Document**

*CDCR 7-233*

This file includes all regulations adopted and published through D.C. Register, Vol. 72, Issue 28, July 11, 2025

**DC - Code of D.C. Municipal Regulations        >        TITLE 7. EMPLOYMENT BENEFITS > CHAPTER 2. PRIVATE SECTOR WORKERS' COMPENSATION PROGRAM**

# 7-233. ADMINISTRATION FUND.

**233.1**  The provisions of this section set forth the policies and procedures which apply to the Administration Fund in accordance with Section 42 of the Act (D.C. Code § 36-341).

**233.2**  The Mayor shall determine, for fiscal years commencing on or after October 1, 1999, the cost of administration of this act for each fiscal year and shall prorate and assess the costs of administration as provided in this section. The cost of administration shall include any expenses that have been incurred, will be incurred, or that will accrue during the fiscal year.

**233.3**  The Mayor shall determine, in each fiscal year commencing on or after October 1, 1999, prior to the commencement of the fiscal year, the cost of administration of this Act. The cost of administration shall include any expenses to be incurred or that will accrue during the fiscal year.

**233.4**  The Mayor shall determine, at the end of each fiscal year, the cost of the administration of this Act. The cost of administration shall include any expenses to be incurred or that will accrue during the fiscal year.

**233.5**  The total amount of costs to administer this Act shall be pro rated among the carriers and self-insurers authorized to insure pursuant to Section 35 of the Act (D.C. Code § 36-334).

**233.6**  The assessment base shall be the total amount of compensation and medical payments that carriers and self-insurers have paid pursuant to this Act during the preceding fiscal year; Provided, however, beginning with the fiscal year commencing on or after October 1, 1999, the Mayor shall have the authority to assess each carrier or self-insured a minimum annual amount of $ 1,000.

**233.7**  The Mayor shall assess each carrier and self-insurer for its pro rata share of the total amount of costs to administer this Act in the fiscal year pursuant to Section 42 of the Act.

**233.8**  The Mayor shall give written notice by certified or registered mail, to each carrier and self-insurer of the assessment against it.

**233.9**  Each assessment shall be payable upon receipt of the notice of assessment and be paid no later than thirty (30) days after receipt of the notice of assessment.

**233.10**  Each carrier and self-insurer who fails to pay the assessment in a timely manner as prescribed by the Office shall be subject to the penalties provided for under the Act.

**233.11**  If a deficit is projected to occur in the administration of the fund, prior to the end of the fiscal year, the Mayor is authorized to implement an emergency assessment in an amount deemed necessary to avoid a deficit. Self-insurers and carriers, on behalf of their policyholders, shall remit the emergency assessment within 30 calender days of notice of the assessment.

**233.12**  Each carrier and self-insurer shall be required to submit to the Office quarterly or at any other time as determined by the Office, a report to include, but not limited to, the amount of compensation and medical payments made pursuant to the provisions of the Act during that reporting period.

**233.13**  The report shall be filed within thirty (30) days after each quarter ends.

7-233. ADMINISTRATION FUND.

**233.14**  If a carrier or self-insurer fails to pay the assessment or to make and preserve records in the form and manner required by the Mayor, to file a report in the form and manner required by the Mayor, or to allow the Mayor to inspect records required by rules issued pursuant to Section 42 of the Act, the Mayor may suspend or revoke the authorization of a carrier to insure for workers' compensation or a self-insurer to act as a self-insurer.

## Statutory Authority

**STATUTORY AUTHORITY:**

 Unless otherwise noted, the authority for this chapter is § 3 (a) of the District of Columbia Workers' Compensation Act of 1979, effective July 1, 1980, D.C. Law 3-77, D.C. Official Code *§ 32-1502* (a) (2001) (WCA); section 2344 of the District of Columbia Comprehensive Merit Personnel Act of 1978 (CMPA), effective March 3, 1979, D.C. Law 2-139, D.C. Official Code *§ 1-623.44* (2001) (collectively, the Acts); Part C of Reorganization Plan No. 3 of 1980 (effective January 10, 1981); and Mayor's Order 82-126 (effective June 24, 1982)

## History

**SOURCE:**

 Final Rulemaking published at    (June 3, 1994); as amended by: Final Rulemaking published at  *47 DCR 6454 (August 11, 2000).*

CODE OF D.C. MUNICIPAL REGULATIONS
Copyright © 2025 Matthew Bender & Company, Inc. a member of the LexisNexis Group. All rights reserved.CODE OF D.C. MUNICIPAL REGULATIONS Copyright (c) Matthew Bender & Company, Inc. a member of the LexisNexis Group. All rights reserved.

**End of Document**

## *CDCR 7-299*

This file includes all regulations adopted and published through D.C. Register, Vol. 72, Issue 28, July 11, 2025

**DC - Code of D.C. Municipal Regulations         >         TITLE 7. EMPLOYMENT BENEFITS
>         CHAPTER 2. PRIVATE SECTOR WORKERS' COMPENSATION PROGRAM**

# 7-299. DEFINITIONS.

**299.1**  The definitions found in § 2 of the Act (§ 36-301, D.C. Code, 1981 ed.), shall apply to this chapter. In addition, the following terms shall have the meaning ascribed:

Act - the District of Columbia Workers' Compensation Act, as amended, (D.C. Law 3-77, effective July 1, 1980, § 36-301 et seq., D.C. Code, 1981 ed.).

Amendment - the Workers' Compensation Equity Amendment Act of 1990 (D.C. Law 8-198).

Attending Physician - the treating physician selected by the claimant to treat the injury or disability. Treatment given by a physician initially selected by the employer or on an emergency basis shall not be considered the selection of an attending physician.

Beneficiary - the surviving spouse, children or other relatives set forth in § 10(d) of the Act (§ 36-309(4), D.C. Code, 1981 ed.) of an employee whose job related injury results in death and shall include any person claiming to be entitled to compensation for the death of an injured employee.

Benefits - compensation for death, wage loss, medical and hospital treatment, health insurance coverage, and vocational rehabilitation provided pursuant to the Act.

Binder - an agreement, or memorandum thereof, whereby an agency or carrier undertakes to provide coverage to an employer pending filing of notice of coverage with the Office.

Certified Safety Professional - any person who has been certified by the American Society of Safety Engineers, American Industrial Hygiene Association or other nationally recognized health and safety industry organization.

Claim - an application for benefits made by an injured employee or his or her beneficiary under Section 8, 9, and 10 of the Act (D.C. Code § 36-307, 36-308, and 36-309, (1981) and (1991 Suppl.)).

Claimant - an individual who files a claim for benefits under Section 8, 9, 0r 10 of the Act (D.C. Code § 36-307, 36-308, and 36-309).

Compensation Order - an order of a Hearing or Attorney Examiner of the Office which rejects a claim or which makes an award of compensation in respect of a claim under the Act.

Council - the National Council on Compensation Insurance, one of whose functions is to assign involuntary coverage to an employer for which coverage cannot be obtained on a voluntary basis in accordance with a voluntary plan.

Coverage - an insurance or other securities to secure the payment of benefits to the employees of employers as defined in this section.

7-299. DEFINITIONS.

Day - a calendar day, unless otherwise specified in the Act or this chapter.

Department - the Department of Employment Services.

Director - the Director of the District of Columbia Department of Employment Services or his or her designated agent.

Establishment - the place where the activities of an enterprise are conducted.

Final Order - an order issued by the Office which formalizes the outcome of an informal or vocational rehabilitation conference.

Formal Hearing - the formal adjudicative processes which are conducted by an Administrative Law Judge or a Hearing or Attorney Examiner in accordance with the District of Columbia Administrative Procedure Act, the Act, and subsequent amendments.

Hearing - the formal adjudicative process conducted by a Hearing or Attorney Examiner in accordance with the District of Columbia Administrative Procedure Act (§ 1-1501 et seq., D.C. Code, 1981), and the Act.

Office of Hearings and Adjudication (OHA) - the administrative entity responsible for conducting formal hearings on claims for benefits.

Identification Number - the employer's numerical designation of an establishment assigned by the Federal Government.

Injury - an injury as defined in § 2(1) of the Act (§ 36-301(12), D.C. Code, 1981 ed.), which combined with a previous occupational or non-occupational disability or physical impairment causes substantially greater disability or death.

Insurance Commissioner - the head of the District of Columbia Department of Insurance and Securities Regulation agency.

Insurer - a "carrier" as defined in § 2(c) of the act or a self-insured employer.

Interested Party - the District of Columbia, and an employer, a carrier, an employee, or a beneficiary whose rights or obligations pursuant to a claim under the Act shall be determined in a particular proceeding, including a mediation conference. Any person appearing at the mediation conference who does not have authority to settle is not an interested party.

Joint Pre-Hearing Statement Form - a form prepared by the party applying for formal hearing and signed by both interested parties that is required to be filed with OHA that includes a brief statement of facts; lists of all uncontested or stipulated facts, contested issues of fact and law, exhibits, witnesses; and statements that discovery is complete and that settlement was actively considered.

Maintenance Expense - an additional payment (not to exceed fifty dollars ($ 50) a week) made under § 8(a) of the Act (§ 36-307(a), D.C. Code, 1981 ed.), by an employer to an injured employee which the Office has determined is necessary for the maintenance of an employee undergoing vocational rehabilitation.

Mediation - the process authorized by this Chapter whereby a claims examiner acts as a mediator to encourage and facilitate the resolution of workers' compensation disputes or claims between two (2) or more parties by assisting such parties in reaching a mutually acceptable and voluntary agreement, thereby dispensing with the need for adjudication by formal hearing.

7-299. DEFINITIONS.

Medical Services and Supplies - a medical, surgical, vocational rehabilitation services (including necessary travel expenses and other attendance or treatment), nurse and hospital service, medicine, crutches, false teeth or the repair thereof, and any artificial or prosthetic appliance.

Occupational Disease - a disease or infection generally recognized by the medical profession as a disease or infection arising naturally out of a particular employment. The term includes, but is not limited to, pneumoconiosis, silicosis, asbestosis, and radiation diseases.

Office - the Private Sector Branch of the Office of Workers' Compensation in the Labor Standards Division of the Department of Employment Services.

Physician - a physician, dentist, osteopath, podiatrist, or chiropractor licensed in:

   **(a)**  accordance with the District of Columbia Health Occupations Revisions Act of 1985, effective January 26, 1986 (D.C. Law 6-99; D.C. Code § 2-3301 et seq.) or;

   **(b)**  any state or jurisdiction of the United States, in accordance with the laws of that state or jurisdiction.

Poster - the employer's notice of compliance with the Act, prescribed by the Department, which is to be conspicuously posted for the information of all employees in accordance with § 37 of the Act (§ 36-336, D.C. Code, 1981 ed.).

Pre-Hearing Conference - a conference conducted by a Hearing or Attorney Examiner for the purpose of defining issues set for formal hearing and/or resolving issues prior to conducting the formal hearing.

Rehabilitation Conference - a conference conducted for the purpose of determining the adequacy, feasibility, and sufficiency of the vocational rehabilitation services.

Reinstatement - the restoring of coverage to effective status.

Scheduling Order - an Order issued by OHA to all interested parties within ten (10) working days of receipt of an application for formal hearing which mandates the parties to submit a Joint Pre-Hearing Statement and sets a date by which a Motion to Amend the Joint Pre-Hearing Statement must be served on the opposing party, a date for the discovery period to close, and a date by which all documentary exhibits will be exchanged and submitted.

Second Injury - an injury as defined in Section 2(1) of the Act (D.C. Code § 36-301 (1981) which combined with a previous occupational or non-occupational disability or physical impairment causes substantially greater disability or death. For injuries occurring on or after April 16, 1999, the second injury fund is repealed.

Self-insurer - and employer who has supplied satisfactory proof of financial ability to pay and has been authorized under § 35(a)(2) of the Act (§ 36-334(a)(2), D.C. Code, 1981 ed.) and § 217 of this Chapter to pay compensation for disability or death benefits directly to a claimant or beneficiary instead of securing insurance coverage through a carrier.

Termination - the cessation of coverage for one of the reasons set forth in Section 216.8 of this Chapter.

Utilization Review - evaluation of only the necessity, character, and sufficiency of both the level and quality of medically related services provided an injured employee based upon medically related standards (D.C. Code Section 36-301 (r-1) and § 36-307(b)).

Vocational Rehabilitation Services - those services required and designed, within reason, to return an injured employee to employment at a wage as close as possible to the wage or greater than what the

7-299. DEFINITIONS.

employee may include the following: vocational counseling, retraining and job skills development, and job placement.

Working Days - the District of Columbia Government business days, excluding Saturdays, Sundays and legal holidays.

## Statutory Authority

STATUTORY AUTHORITY:

Unless otherwise noted, the authority for this chapter is § 3 (a) of the District of Columbia Workers' Compensation Act of 1979, effective July 1, 1980, D.C. Law 3-77, D.C. Official Code *§ 32-1502* (a) (2001) (WCA); section 2344 of the District of Columbia Comprehensive Merit Personnel Act of 1978 (CMPA), effective March 3, 1979, D.C. Law 2-139, D.C. Official Code *§ 1-623.44* (2001) (collectively, the Acts); Part C of Reorganization Plan No. 3 of 1980 (effective January 10, 1981); and Mayor's Order 82-126 (effective June 24, 1982)

## History

SOURCE:

In effect as of January 1986; as amended by: Final Rulemaking published at  *47 DCR 6454 (August 11, 2000).*

CODE OF D.C. MUNICIPAL REGULATIONS
Copyright © 2025 Matthew Bender & Company, Inc. a member of the LexisNexis Group. All rights reserved.CODE OF D.C. MUNICIPAL REGULATIONS Copyright (c) Matthew Bender & Company, Inc. a member of the LexisNexis Group. All rights reserved.

**End of Document**

**END OF ADDENDUM**